Bruce I. Gheen and Jean Gheen v. Commissioner.
Gheen v. Commissioner
Docket No. 92209.
United States Tax Court
T.C. Memo 1963-122; 1963 Tax Ct. Memo LEXIS 222; 22 T.C.M. (CCH) 570; T.C.M. (RIA) 63122; April 30, 1963
*222 Taxpayer purportedly borrowed money to purchase United States Treasury notes which were to be pledged as collateral on his loans. The Treasury notes were delivered by the "lender" to cover its short sale to another. Petitioner had neither the use nor the forbearance of either the "borrowed" funds or the "purchased" notes. Held: (1) Amounts paid to the "lender" and denominated "prepaid interest" are not deductible as interest. (2) Petitioners' innocence of the "lender's" intention to dispose of the "collateral" is irrelevant. W. Dean Hopkins, Esq., 1105 E. Ohio Bldg., Cleveland, Ohio, for the petitioners. Buckley D. Sowards, Esq., for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: Respondent *223 determined deficiencies of $18,026.95 and $29,733.08 in petitioners' income taxes for the years 1957 and 1958, respectively. The only issue to be determined is the deductibility as interest expense of amounts paid by petitioners in connection with transfers of United States Treasury notes. Findings of Fact Some of the facts have been stipulated and are hereby found as stipulated. Bruce I. Gheen and Jean Gheen, husband and wife, residing at 15750 Shaker Boulevard, Shaker Heights 20, Ohio, filed joint income tax returns for 1957 and 1958 with the district director of internal revenue at Cleveland, Ohio. For the years before us petitioners kept their books and filed their income tax returns for calendar years on the cash receipts and disbursements basis. Since Jean Gheen is a petitioner herein only because she filed joint returns with her husband for the years before us, Bruce I. Gheen will hereinafter be referred to as the petitioner. During 1957 and 1958 petitioner was a life insurance agent specializing in estate planning and business insurance matters and was president of Retirement Plans, Inc. In 1956, an associate of petitioner introduced him to M. Eli Livingstone (hereinafter *224 sometimes referred to as "Livingstone") of Boston, Massachusetts. Livingstone and petitioner collaborated on a business arrangement involving one of petitioner's clients whereby Livingstone made a profit. As a result of this business association, Livingstone proposed that petitioner enter into a transaction involving United States Treasury notes. Petitioner, who is not a dealer in securities, had never purchased United States Treasury notes prior to 1957. By letter dated December 20, 1957, petitioner ordered from C. F. Childs and Company (hereinafter sometimes referred to as "Childs") $500,000 of 1 1/2 percent United States Treasury notes of October 1, 1962, and requested delivery thereof to Corporate Finance Corporation (hereinafter sometimes referred to as "CFC") against payment of $474,271.98. The actual order was placed by Livingstone & Company. By letter of the same date CFC directed Childs to deliver the Treasury notes to R. W. Pressprich & Co. (hereinafter sometimes referred to as "Pressprich"), in New York City. Childs' confirmation of the transaction to petitioner, dated December 20, 1957, noted: "Dely NY at R W Pressprich." The confirmation slip stated a price of $472,500 *225 and accumulated interest to December 26, 1957, of $1,771.98. By letter of the same date Livingstone's secretary directed petitioner to "sign the Notes and letter of instruction, and return them to this office together with your check in the amount of $28,986.43 made payable to Corporate Finance Corporation which represents the prepayment of interest." By letter of the same date (but noting "Delivery Date: December 26, 1957") petitioner directed CFC to receive the Treasury notes for his account against payment of $474,271.98. The letter accompanied petitioner's promissory note dated December 26, 1957, in favor of CFC for $472,500 payable on October 1, 1962, with interest at 2 7/8 percent. The note stated that $28,986.43 of interest had been prepaid and the balance of $35,728.02 was to be paid as follows: $1,978.02 on April 1, 1958, and $3,750 semiannually beginning October 1, 1958. The note recited as follows: The undersigned gives to the obligee a lien against the securities pledged for the amount of the obligation set forth herein and gives to the obligee the right to hypothecate and use the securities pledged for any purpose while so pledged. Said right is not to be inconsistent *226 in any manner with the ownership by the undersigned of the said collateral, and with the right to the undersigned to obtain the return of the collateral at any time upon tender of payment of the amount due hereunder. The undersigned shall not be called upon to furnish additional collateral during the term of this Note. On or about December 23, 1957, petitioner mailed his check in the amount of $28,986.43 to CFC as payment of the amount called for as interest by the December 26, 1957, note. This check was deposited by CFC to its account and cleared petitioner's bank on December 30, 1957. On December 20, 1957, CFC sold short $500,000 United States Treasury 1 1/2 percent notes of October 1, 1962, to Pressprich. CFC used the Treasury notes ordered in petitioner's name to cover its short pesition with Pressprich. By letter dated October 28, 1958, but addressed on or about October 24, petitioner ordered from Childs $500,000 of 1 1/2 percent United States Treasury notes of April 1963, and requested delivery thereof to CFC against payment of $455,679.95. The actual order was placed by Livingstone & Company. By letter dated November 1, 1958, CFC directed Childs to deliver the Treasury *227 notes to Cruttenden, Podesta & Co. (hereinafter sometimes referred to as "Cruttenden"). Childs' confirmation of the transaction to petitioner, dated October 24, 1958, noted: "Dely N.Y." The confirmation slip stated a price of $455,000 and accumulated interest to November 3, 1958, of $679.95. By letter dated October 24, 1958, Livingstone's secretary directed petitioner to issue checks to South Side Bank and Trust Co. (hereinafter sometimes referred to as "South Side") in the amounts of $22,883.26 and $21,793.58. Enclosed with the letter were documents relating to the sale requiring petitioner's signature and "a check in the amount of $38,500.00 payable to your order, representing the proceeds of your loan with us." Petitioner executed and delivered to CFC a note dated November 3, 1958, in favor of CFC for $250,000 payable April 1, 1963, with interest at three percent. The note contained recitations regarding collateral ("$500,000.00 U.S. Treasury 1 1/2% Notes due April 1, 1963") in exactly the same language as the December 26, 1957, note, supra, except that petitioner was permitted to obtain the return of the collateral only on April 1, 1963, instead of "at any time." No amounts *228 were paid as interest on this note in 1958. Petitioner executed and delivered to South Side two notes both dated November 3, 1958, both to be paid on April 1, 1963, and both with interest at 415/16 percent per annum. The notes, for $105,000 and $100,000, were accompanied by petitioner's checks for $22,883.26 and $21,793.58, respectively, those being prepayments of the amounts called for as interest on the notes. The checks cleared petitioner's bank on November 6, 1958. By letters dated November 3, 1958, petitioner directed South Side to pay the proceeds of the two notes to CFC, which South Side did by crediting CFC's account. Petitioner's notes to South Side contained no recitals regarding collateral and South Side received no collateral in connection with this transaction. This "loan" was arranged by Livingstone & Company. By letters dated November 3, 1958, CFC confirmed the purchase of those notes from South Side and sent South Side its (CFC's) check for the face value of the note. South Side endorsed the notes to CFC "without recourse and without warranty, guaranty or representation of any nature whatsoever." By letter dated November 12, 1958, South Side notified petitioner *229 of its sale of petitioner's notes to CFC. By letter of the same date South Side notified CFC that South Side had credited to CFC's account $44,189.39 "representing unearned interest due you on these two loans, less our charges." On October 24, 1958, CFC made a short sale of $500,000 United States Treasury 1 1/2 percent notes of April 1, 1963, to Cruttenden. CFC used the Treasury notes ordered in petitioner's name to cover their short position with Cruttenden. In his 1957 return, petitioner's itemized interest expense deductions included $28,986.43 to CFC, which amount was disallowed by respondent. In his 1958 return, petitioner's reported income included $5,728.02 from U.S. Treasury notes. His itemized interest expense deductions included $5,728.02 to CFC and $44,676.84 to South Side. Respondent disallowed the deduction for the amount paid to South Side. On or about September 7, 1962, petitioner arranged to borrow $476,284.13 from the National City Bank (hereinafter sometimes referred to as "National City") Cleveland, Ohio. Petitioner pledged $500,000 United States Treasury 1 1/2 percent notes of October 1, 1962, as collateral in this transaction. National City received this *230 collateral by paying petitioner's December 26, 1957, prommisory note to CFC. The mechanics of this transaction were as follows: (1) National City instructed the First National Bank (hereinafter sometimes referred to as "First National") of Boston, Massachusetts, to pay petitioner's note to CFC by charging their account upon delivery of the note and collateral securities. (2) CFC ordered Treasury notes similar to the ones pledged as security by petitioner to be delivered to First National along with petitioner's December 26, 1957, note. (3) First National paid for the Treasury notes and charged the account of National City. (4) The Treasury notes and petitioner's note dated December 26, 1957, were then delivered to National City. Petitioner's payments here at issue were not payments of interest on indebtedness. Opinion Petitioner claims deductions under section 163(a) of the Internal Revenue Code of 1954[1] for payment of interest on indebtedness. He seeks to distinguish the other cases in this area on the grounds that there the taxpayers knew or should have known that they were not entering into real transactions while here petitioner did not know of the *231 sham involved. Respondent's view is that the transaction was a sham in that no funds were lent, petitioner had neither the use nor the forbearance of money, and consequently petitioner paid no "interest * * * on indebtedness" within the meaning of the cited section. We agree with respondent. This is another in a series of cases in which a taxpayer "borrows" money to purchase United States Treasury notes but acquires control of neither the "borrowed" money nor the "purchased" notes. In the meanwhile, the taxpayer has paid an amount denominated "interest," expects to receive another, perhaps lesser, amount denominated "capital gain," and expects to profit to the extent the "capital gain" less tax exceeds the "interest" less tax saving on the deduction. The result of the 1957 transaction was that Childs sold Treasury notes which found their way, at the direction of Livingstone, petitioner, and then CFC, to Pressprich. Pressprich transferred money to CFC which money then found its way, at the direction of petitioner and then *232 CFC, to Childs. The 1958 transaction followed the same pattern except that Cruttenden was substituted for Pressprich. South Side's participation in the 1958 transaction was a diversion with no real significance. [2]
Each transaction involved, ultimately, a sale of Treasury notes by Childs and a purchase of those notes by Pressprich in 1957 and Cruttenden in 1958. In each instance, when the flurry of papers subsided, petitioner "owed" money to CFC, [3] which in turn was "obligated" to petitioner for the *233 fungible Treasury notes allegedly held as collateral. This was the extent of each transaction's substance to petitioner. The transaction had no more substance to petitioner, for our purposes, than the types of paper transactions heretofore condemned in Eli D. Goodstein, 30 T.C. 1178 (1958), affd. 267 F. 2d 127 (C.A. 1, 1959), and a long line of subsequent decisions, most recently, Joseph H. Bridges, 39 T.C. - (March 27, 1963), and Carl Shapiro [26,064], 40 T.C. - (April 12, 1963).
Petitioner never acquired, as a result of the 1957 and 1958 transactions, control of either the funds purportedly lent to him or the Treasury notes purportedly sold to him. He had neither the use nor the forbearance of money. See Deputy v. du Pont, 308 U.S. 488, 498 (1940). Joseph H. Bridges, supra, involved a fact pattern quite similar to *234 the one we face here. We held there that the amounts paid were not deductible as interest. We find no significant difference in petitioner's favor between that case and this. Petitioner stresses his absence of knowledge in 1957 and 1958 that CFC planned to dispose of the notes, as an indication of the absence of sham. On a number of occasions in this type of case we and other courts have stated, in reaching our conclusions, that we will not make the taxpayer's innocence or gullibility the criterion in determining whether an amount paid was really interest on indebtedness. Lynch v. Commissioner, 273 F. 2d 867, 872 (C.A. 2, 1959), affirming 31 T.C. 990 (1959); Gordon MacRae, 34 T.C. 20, 28 (1960), reversed in part but affirmed on this point, 294 F. 2d 56, 59 (C.A. 9, 1961); Perry A. Nichols, 37 T.C. 772, 788-789 (1962), affd. 314 F. 2d 337, 338 (C.A. 5, 1963). We adhere to that view in this case. We conclude that petitioner's payments were not interest or indebtedness within the meaning of the statute. Petitioner cites L. Lee Stanton, 34 T.C. 1 (1960), for the proposition that the deductibility *235 of interest under section 163 does not depend upon business purpose or upon whether the transaction would have been entered into but for its hoped-for favorable tax consequences. Even if we were to agree with that proposition, it would not assist petitioner in this case. Petitioner's motive is not the controlling issue. The question is rather whether petitioner received something which would constitute "some valid commercial reason for paying interest." Joseph H. Bridges, supra (Mimeo p. 21). In Stanton, the taxpayer was in form indebted to the bank which had in substance advanced its funds. Here, petitioner was in form indebted to CFC (see footnote 3, supra) but only Pressprich and Cruttenden had advanced funds and neither of them advanced those funds to petitioner. In Stanton, the lender held the collateral. Here, CFC, the purported lender (see footnote 3, supra), held no collateral. The "collateral was owned by Pressprich and Cruttenden. In short, the Stanton transactions were in substance what they purported to be in form, even though they were entered into largely if not entirely for tax purposes. Here, the transactions were not what they purported to be. We do not believe that *236 petitioner had any valid commercial reason for paying interest. At the trial in this case we reserved decision on respondent's objection to the introduction of lie detector test evidence purporting to show that petitioner told the truth when he denied knowledge of CFC's disposition of the Treasury notes. Since our decision does not depend upon petitioner's veracity regarding that point, on reflection, we sustain respondent's objection to the introduction of this evidence on ground of revelance. We hold for respondent. Decision will be entered for the respondent. Footnotes
1. SEC. 163. INTEREST. (a) General Rule. - There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness.↩
2. Petitioner's notes went to South Side, which passed them on to CFC. South Side credited petitioner with funds but transferred the credit at petitioner's direction to CFC, which in turn purchased petitioner's notes from South Side. South Side also transferred to CFC all of petitioner's "interest" payments "less our charges." The $500,000 Treasury notes were purportedly used as collateral on the $250,000 note to CFC and the parties apparently made no effort to erect even a facade of collateral for the two notes to South Side. The effect of this was that South Side regained the funds it purportedly loaned to petitioner and CFC acquired petitioner's notes and "interest" payments.↩
3. As we have indicated, South Side served no commercial function in this transaction. Petitioner's notes to South Side found their way almost immediately to CFC. CFC "held" all the "collateral" suporting the "loans." Under these circumstances we treat petitioner's notes to South Side as being in "substance" notes to CFC.↩