Matthew M. BECKER and Anne M. Becker, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

COMMISSIONER OF INTERNAL REVENUE, Petitioner,

v.

Matthew M. BECKER and Anne M. Becker, Respondents.

Nos. 244, 245, Dockets 25924, 25925.

United States Court of Appeals Second Circuit.

Argued Feb. 29, 1960.

Decided April 5, 1960.

————◆————

John P. Allison, New York City (Marshall, Bratter, Greene, Allison & Tucker, New York City, on the brief), for Matthew M. Becker and Anne M. Becker.

Grant W. Wiprud, Attorney, Department of Justice, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Harry Baum, Attorneys, Washington, D. C., on the brief), for Commissioner of Internal Revenue.

Before CLARK, MOORE and FRIENDLY, Circuit Judges.

FRIENDLY, Circuit Judge.

Taxpayers' petitions for review, like those in Lynch v. Commissioner, 2 Cir., 1959, 273 F.2d 867, Goodstein v. Commissioner, 1 Cir., 1959, 267 F.2d 127 and Sonnabend v. Commissioner, 1 Cir., 1959, 267 F.2d 319, and the refund suit in Broome v. United States, Ct.Cl.1959, 170 F.Supp. 613, involve variants of the plan for reducing income taxes by deductions for the alleged payment of interest on loans to finance the purchase of Government securities devised by M. Eli Livingstone of Boston. The particular plan used by petitioners differed from that in Lynch v. Commissioner, supra, in respects which we deem immaterial. However, here, in contrast to the cases thus far decided, the transactions were completed in the taxable years involved. Hence it becomes necessary to determine the question, reserved in Lynch as well as in Goodstein, as to what tax recognition, if any, should be given to the sums by which taxpayers ended out of pocket.[1]

Since the general nature and purpose of the plan have been discussed in the cases cited and a full statement of the facts and claims is contained in the opinion of the Tax Court, it will suffice here to outline the transaction in summary form:

(1) On April 6, 1953, Becker, through Marks, his accountant, placed an order with Livingstone to buy $5,000,000 U. S. Treasury 1⅜% notes maturing March 15, 1954.

(2) Livingstone, as Becker's agent, ordered C. F. Childs & Co. to deliver these Treasury notes to Livingstone's account at Guaranty Trust Company of New York. The price was 99–9/32, or a principal sum of $4,964,062.50, plus accrued interest of $4,296.87, for a total of $4,968,359.37.

(3) Becker paid Livingstone $10,000 by check. For the balance he executed a non-recourse note for $4,958,359.37, bearing interest at the rate of 2⅜%, and payable March 15, 1954, to Seaboard Investment Associates, Inc. Seaboard was a dummy of Livingstone's similar to Gail Finance Corporation described in Lynch, and the note was also similar in its provisions for pledge of the Treasury notes, prepayment with penalty interest, absence of personal liability except from the proceeds of the collateral, etc.

(4) Simultaneously Becker directed Livingstone to deliver the Treasury notes to Seaboard against payment by Seaboard of $4,958,359.37, which he instructed Seaboard to make.

(5) Livingstone directed Guaranty, *first,* to receive delivery of the $5,000,000 Treasury notes from Childs for Livingstone's account against payment to Childs of $4,968,359.37 (see item (1)) to be charged to his account and, *second,* to redeliver the notes to Childs for $4,967,578.12 to be credited to his account. Delivery and redelivery were made and ap-

---

1. In view of our decision herein there is no occasion to do more than mention the protective cross-petition filed by the Commissioner.

propriate checks drawn. Livingstone also issued a confirmation slip to Seaboard stating that as its agent he had sold $5,000,000 of Treasury notes for $4,967,578.12 less Livingstone's commission of $6,250, or $4,961,328.12 net. Neither Becker nor Marks had given an order for this sale.

(6) Late in September, 1953, Seaboard submitted a statement to Becker in care of Marks showing a balance of $22,-587.08 of interest due. Marks had ascertained the market value of the Treasury notes had increased sufficiently that Seaboard would advance Becker another $22,500 without recourse and thought it desirable in view of supposed tax advantages that Becker make an interest payment in 1953. Seaboard issued a check to Becker for $22,500. Becker executed a promissory note in that amount to Seaboard upon the same terms as his note of April 7, and issued his check for $22,587.08 to Seaboard in payment of interest.

(7) Late in October, the notes having appreciated to 100 or fractionally more, Marks placed a sell order with Livingstone. Livingstone told Marks that Seaboard was short of the notes, could not cover and was financially irresponsible.

(8) On December 7, 1953, a settlement was arranged as follows:

(a) Becker sold $5,000,000 Treasury notes to Livingstone who assumed his "principal" indebtedness to Seaboard in the sum of $4,976,562.50, i. e., the original note of $4,958,359.37 (item (3)) minus the prepaid interest item of $4,-296.87 included therein (item (1)) plus the second note of $22,500 (item (6)).

(b) Becker remained liable to Seaboard for interest of $27,224.83 and a prepayment penalty of $3,386.78 or a total of $30,611.61. This, however, was reduced by a credit of accrued interest on the Treasury notes of $15,763.11, leaving a balance of $14,848.50. Becker paid $6,461.72 by check dated December 10, 1953, and signed negotiable notes, dated December 7, 1953, for $8,386.78. These notes, bearing interest at the rate of 4%, were payable and paid January 4, 1954, the total payment on them being $8,412.-87.

(c) Livingstone paid Becker $17,162.-50 in 1953.

(d) Becker paid an attorney's fee of $725, also in 1953.

When all this was finished, Becker was out of pocket on this $5,000,000 transaction as follows:

```
Initial payment to Livingstone (item (3)) ......$10,000.00
Excess of October, 1953, payment to Seaboard
 over loan (item (6)) ...................... 87.08
December, 1953, payments to Seaboard (item
 (8) (b)) ................................ 6,461.72
January, 1954, payments to Seaboard (item
 (8) (b)) ................................ 8,412.87
Attorney's fee (item (8) (d)) ............... 725.00
 -----------
 $25,686.67
Less payment from Livingstone (item (8) (c)) 17,162.50
 -----------
 $ 8,524.17
```

━━━━━◆━━━━━

 Until the attempted sale in late October, 1953, the transaction was similar to that in Lynch save that Becker did not prepay the interest, thereby reserving judgment whether he would take the interest deduction in 1953 or 1954 or partly in each, and that the $5,000,000 Treasury notes journeyed from C. F. Childs & Co. to Guaranty Trust Co. and back. It was identical with that in Good-

stein v. Commissioner, supra. We hold here, as was held in those cases, that the taxpayer was not entitled to a deduction for interest on his notes pursuant to § 23 (b) of the 1939 Internal Revenue Code, 26 U.S.C.A. § 23(b), for "interest paid or accrued * * * on indebtedness," since in fact "no money was used or forborne." Lynch v. Commissioner, 273 F.2d at pages 871–872. Becker seeks to distinguish that holding because of his momentary liability to Childs & Co. as undisclosed principal; but any such liability was immediately discharged by the re-sale. As said by the First Circuit in Goodstein, 267 F.2d at page 131, "Despite the transitory possession by the Guaranty Trust Company of the Treasury notes for Livingstone's account who was acting as the taxpayer's agent, there was never in substance either a purchase of the notes by the taxpayer or a borrowing of the purchase funds from Seaboard."

Becker contends that if the interest deduction is disallowed, he should be permitted to deduct his loss of $8,524.17 under § 23(e)(2) of the 1939 Code permitting the deduction of losses incurred by an individual "in any transaction entered into for profit, though not connected with the trade or business." The Commissioner answers that the transaction was not "entered into for profit" but solely for the purpose of achieving an interest deduction. Becker denies this, pointing to the almost certain appreciation of the Treasury notes as their maturity approached. We need not pass on this controversy. For the nature of Becker's loss is clearly delineated by § 117(g)(2) of the 1939 Code, 26 U.S.C.A. § 117(g)(2), which prescribes that "gains or losses attributable to the failure to exercise privileges or options to buy or sell property shall be considered as short-term capital gains or losses." As intimated by the First Circuit in Goodstein v. Commissioner, supra, 267 F.2d at page 132 and by us in Lynch v. Commissioner, 273 F.2d at page 870, this was what Becker's contract was. Consequently, since the negotiable notes ap-pear to have been taken in payment, the amount by which Becker was out-of-pocket, save for $26.09 of interest on the notes, to wit, $8,498.08, was a short-term capital loss incurred in 1953, see 2 Mertens, Law of Federal Income Taxation, §§ 11.07, 12.52; cf. Schlemmer v. United States, 2 Cir., 1938, 94 F.2d 77, 78; the $26.09 is allowable as an interest deduction in 1954.

Taxpayers' petitions to review are granted to the limited extent of remanding the case to the Tax Court for a redetermination of deficiencies on this basis.