**Maxwell RUBIN, Plaintiff-Appellant,**

v.

**UNITED STATES of America,
Defendant-Appellee.**

**No. 13598.**

United States Court of Appeals
Seventh Circuit.

June 28, 1962.

. William P. Rosenthal, Leonard Schanfield, Chicago, Ill., for appellant.

Louis F. Oberdorfer, Asst. Atty. Gen., Giora Ben-Horin, Atty., Tax Div., U. S. Dept. of Justice, Washington, D. C., James P. O'Brien, U. S. Atty., Chicago, Ill., Lee A. Jackson, Harry Baum, Attys., Dept. of Justice, Washington, D. C., for appellee.

Before DUFFY, KILEY, and SWYGERT, Circuit Judges.

SWYGERT, Circuit Judge.

Taxpayer, Maxwell Rubin, brought this action in the District Court to recover an alleged overpayment of federal income taxes, plus interest, in the amount of $21,232.22, arising from a disallowance by the Commissioner of Internal Revenue of a deduction for interest [1] claimed by taxpayer in 1953. The court found that

---

1. The applicable statute, Section 23(b) of the Internal Revenue Code of 1939, 26 U.S.C. § 23(b), provides in part as follows:

"§ 23. *Deductions from gross income.* In computing net income there shall be allowed as deductions:
&ast; &ast; &ast; &ast; &ast;
"(b) *Interest.* All interest paid or accrued within the taxable year on indebtedness, &ast; &ast; &ast;."

the transaction in question did not in substance create an indebtedness and that no interest was paid by taxpayer. Accordingly, the court entered judgment dismissing taxpayer's complaint. Taxpayer appeals from this judgment.

The facts found by the District Court are substantially as follows:

On May 27, 1953 taxpayer placed a purchase order with Livingstone and Company of Boston, Massachusetts [2] for $5,000,000 face amount United States Treasury 1⅜% notes maturing March 15, 1954. Subsequently, taxpayer received a confirmation slip from Livingstone purporting to show the purchase by Livingstone for taxpayer's account of the ordered securities at a principal purchase price of $4,960,937.50, plus accrued interest of $14,011.55, or a total purchase price of $4,974,949.05.

On May 28, 1953 taxpayer executed a check for $7,500 to the order of Livingstone as part payment for the securities. To finance the remainder of the purchase price he executed a non-recourse promissory note on May 29, 1953 to Seaboard Investment Associates, Inc. of Boston, Massachusetts.[3] The note was in the amount of $4,967,449.05 and the maturity date was March 15, 1954. It recited an interest rate of 2⁹⁄₁₆% per annum, further that $5,000,000 United States Treasury 1⅜% notes due March 15, 1954 had been deposited as collateral, and it gave Seaboard a lien on the securities for the face amount of the note. The note also gave Seaboard "the right to hypothecate and use the securities pledged for any purpose while so pledged," and provided that taxpayer was not to "be called upon nor be liable to furnish additional collateral." Under the terms of the note, taxpayer had the right to pay the note before maturity, and in that event, he was to be charged interest at the rate of ¼% per annum from date of payment to maturity.

On May 29, 1953 taxpayer forwarded his $7,500 check to Livingstone together with a letter requesting Livingstone to deliver to Seaboard $5,000,000 face amount United States Treasury 1⅜% notes as security for the loan. On the same day taxpayer sent Seaboard the promissory note together with a letter requesting Seaboard to receive $5,000,000 face amount United States Treasury 1⅜% notes from Livingstone and requesting it to disburse the proceeds to Livingstone to complete payment for the securities.

On May 27, 1953 Seaboard, for the ostensible purpose of obtaining the funds to make the loan to taxpayer, placed a short sale order with Livingstone for $5,000,000 face amount United States Treasury 1⅜% notes maturing March 15, 1954.

Livingstone executed taxpayer's purchase order by a purchase from C. J. Devine and Company. Livingstone executed Seaboard's short sale order by a sale to Devine. On May 29, 1953 delivery on taxpayer's purchase order and on Seaboard's short sale order was made at the Guaranty Trust Company of New York. On the same day Guaranty charged the account of Livingstone in the amount of the purhase price on receipt of the securities, and Livingstone satisfied Seaboard's delivery commitment on the short sale by redelivering to Devine the same securities. Guaranty then credited Livingstone's account with the identical amount it had charged his account.

No securities were actually delivered by Livingstone to Seaboard for taxpayer's account, nor did Livingstone actually

2. The individual proprietorship of M. Eli Livingstone, a self-styled investment banker.

3. According to the deposition of Harry N. Cushing, the president and treasurer of Seaboard, and a friend of Livingstone, the corporation was formed in 1952 or 1953. Its original capital contribution was $500 and its largest bank balance during the period of this transaction was estimated by Cushing to be $134,000. Seaboard's office was in the law office of Cushing. It had no telephone listing and was not listed in the directory of business enterprises in Boston.

pay to Seaboard any money on Seaboard's short sale. Moreover, Seaboard did not furnish Livingstone any money to cover taxpayer's purchase order. Seaboard had a running account with Livingstone and the transaction was handled by debits and credits to this account.

On December 7, 1953 taxpayer placed a sale order with Livingstone for $5,000,000 face amount United States Treasury 1⅜% notes maturing March 15, 1954. Livingstone sent taxpayer a confirmation of sale at a principal price of $5,001,562.50, plus accrued interest of $15,763.12, or a total sale price of $5,017,325.62. On the same date, taxpayer sent a letter to Livingstone, requesting Livingstone to receive from Seaboard $5,000,000 United States Treasury 1⅜% notes upon Livingstone's payment to Seaboard of $5,017,325.62. He also sent a letter to Seaboard, requesting Seaboard

to deliver to Livingstone $5,000,000 United States Treasury notes upon Livingstone's payment of the $5,017,325.62, and requesting that Seaboard apply this amount "against my loan and remit to me the excess proceeds." On the same date, Seaboard, in order to cover its short position, placed a purchase order with Livingstone for $5,000,000 United States Treasury 1⅜% notes maturing March 15, 1954. The purchase price was the same amount that taxpayer received for his sale of the securities.

No securities were actually delivered by Livingstone on the execution of either the sale or purchase order; instead Livingstone balanced the orders by debits and credits to Seaboard's account with him.

Subsequently taxpayer received a settlement statement from Seaboard showing the following computation:

|  | Principal | | Interest |
| --- | --- | --- | --- |
| Purchase at 99 7/32 | $4,960,937.50 | | |
| Accrued interest | 14,011.55 | | |
| Total cost | 4,974,949.05 | | |
| Deposit paid | 7,500.00 | | |
| Amount of note | 4,967,449.05 | | |
| Interest 5/29/53–9/15/53 | | | $ 38,540.95 |
| Accrued interest credited 9/15/53 | 14,011.55 | | |
| Interest 9/15/53–12/7/53 | 4,953,437.50 | | 29,264.91 |
| Int. at ¼% from 12/7/53 to 3/15/54 | | | 3,371.31 |
| | | | $ 71,177.17 |
| Credit | | | |
| Coupon 9/15/53 | $ 34,375.00 | | |
| Less accrued interest | 14,011.55 | $20,363.45 | |
| Accrued interest to 12/7/53 | | 15,763.12 | 36,126.57 |
| Balance of interest due | | | 35,050.60 |
| Principal due | | | 4,953,437.50 |
| Total amount due | | | 4,988,488.10 |
| Proceeds of sale at 100 1/32 | | | 5,001,562.50 |
| Balance due customer | | | $ 13,074.40 |

With the settlement statement taxpayer received a check from Seaboard for $13,074.40.

In his income tax return for the calendar year 1953, taxpayer claimed an interest deduction of $77,177.17 paid to Seaboard. He also reported a long term capital gain of $40,625.00 from "U. S. Treasury 1⅜ Notes," and interest income of $36,126.57 from "U. S. Treasury Notes." On audit of this return, the Commissioner disallowed the claimed interest expense deduction and eliminated the two items of reported income. The resulting deficiency of $17,633.13 was assessed and collected with interest, and it is this amount for which taxpayer seeks a refund.

The issue is whether the District Court erred in finding that the transaction above set out did not in substance create a valid indebtedness between taxpayer and Seaboard. If there was no valid indebtedness, then taxpayer was not entitled to a deduction for interest under Section 23(b) of the 1939 Code.

In determining whether the purported indebtedness was valid, it would serve no purpose to examine each step in the purported acquisition and sale by taxpayer of the securities. The government conceded in oral argument that taken one by one each step may be in accord with normal business activity. Many real and substantial business transactions may involve some steps similar to the individual steps taken by taxpayer here. That is, in real transactions investors may borrow in order to make purchases of securities; brokers may hold securities as collateral and, if necessary, borrow the securities held as collateral in order to cover short sales; lenders may lend much more than their actual capital; non-recourse promissory notes may be given for borrowed money; and securities may change hands by debiting or crediting accounts rather than by actual delivery. Cf. MacRea v. Commissioner, 34 T.C. 20, affirmed 9 Cir., 294 F.2d 56.

What we must decide is not whether the individual steps necessary to establish a formalistic debtor-creditor relationship were undertaken but whether, when the transaction is considered as a whole and realistically, there was in substance a debtor-creditor relationship. In other words, we must determine whether taxpayer paid interest for the "use or forbearance of money" actually loaned. Deputy v. DuPont, 308 U.S. 488, 498, 60 S.Ct. 363, 84 L.Ed. 416.

The government contends the indebtedness was not real and that this suit involves the same question resolved adversely to other taxpayers in a series of recent cases which denied claimed deductions for interest on purported indebtednesses arising from transactions very similar if not identical to the case at bar. Among the cases cited by the government are: MacRae v. Commissioner, supra; Lynch v. Commissioner, 2 Cir., 273 F.2d 867; Becker v. Commissioner, 2 Cir., 277 F.2d 146; and Goodstein v. Commissioner, 1 Cir., 267 F.2d 127. In all of these cases except MacRae, Eli Livingstone was the broker who handled the securities transactions, and in Becker, Seaboard was the finance company. The government maintains that the underlying objectives in all the cases were to create, for high bracket taxpayers, large interest deductions without either much actual cash outlay or financial risk on the part of the taxpayers.

Taxpayer concedes that Goodstein, Lynch, and MacRae have held against the taxpayers in situations similar to that presented here, but contends that we must apply the test laid down by the Supreme Court in Knetsch v. United States, 364 U.S. 361, 365, 81 S.Ct. 132, 135, 5 L.Ed.2d 128, where the Court, quoting Gregory v. Helvering, 293 U.S. 465, 469, 55 S.Ct. 266, 79 L.Ed. 596, stated:

" 'The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted. * * * But the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended.' "

Knetsch involved claimed interest expense deductions similar to the instant case except that the questioned transaction concerned so-called purchases of insurance annuity contracts with borrowed funds secured by the annuity bonds. The Court held that the transaction was a sham since there was nothing of substance to be realized by Knetsch from the transaction beyond a tax deduction.

Taxpayer maintains that in the instant case his beneficial interest was appreciably affected beyond a reduction in his taxes; that when he entered into the transaction, he had in mind the possibility of economic profit as well as tax advantages; and that he, in fact, realized a cash profit of $5,574.40 on his cash investment of $7,500. Consequently, taxpayer contends that since he realized something of substance, his interest expense should be allowed under the Knetsch holding as a legitimate tax deduction.

We do not believe that Knetsch is inconsistent with the cases cited by the government. The question for decision in Knetsch was "whether what was done, apart from the tax motive, was the thing which the statute intended." We believe that in the instant case there was, in substance, no genuine indebtedness regardless of taxpayer's motives; that no interest was paid for the use or forbearance of money; and consequently, taxpayer should be allowed no interest expense deduction.

Insofar as the purported loan was concerned, what transpired was nothing more than a "financial round robin." Broome v. United States, 170 F.Supp. 613, 145 Ct.Cl. 298. (Broome also involved Eli Livingstone). In reality, this paper transaction setting up the "loan" did not involve any Treasury notes owned either by taxpayer or Seaboard or any real money represented by the "loan." No payment was actually made by taxpayer to Livingstone for the Treasury notes except the $7,500; no Treasury notes were delivered by taxpayer or Liv-

ingstone to Seaboard for collateral. Moreover, no money was actually advanced to Livingstone by Seaboard to make up the balance of the purchase price of the Treasury notes, and no interest was actually paid Seaboard by taxpayer.

We agree with the view expressed by the Tax Court in MacRae, 34 T.C. 20, 26 (decided after Knetsch), that:

"The steps taken, each in itself a legitimate commercial operation, were here each mirror images, and add up to zero. The various purchases and sales, each real *without the other*, neutralize one another and fairly shout to the world the essential nullity of what was done. No purchase and no sale is essentially identical with what was done here, i. e., identical and virtually simultaneous purchases and sales. The choice of the more complicated and involved method of doing nothing had no purpose, save the erection of the facade upon which petitioners now seek to rely."

We do not believe the fact that in the instant case taxpayer made a profit on the transaction distinguishes it from MacRae. Due to the fluctuations in the market it was likely that taxpayer would either make or lose money on the transaction; but this was incidental to the chimerical character of the transaction.

In MacRae and in Becker, the courts recognized that, while the transactions created no indebtedness, various legal rights and obligations were created and consequently the taxpayers were allowed to deduct their out-of-pocket losses arising from the transactions.[4] The holdings in those cases lend additional support to our view that taxpayer's profit in the instant case is immaterial to the question before us. The losses suffered by the taxpayers in MacRae and Becker and their deductibility for income tax purposes did not prevent the courts in those cases from seeing through the transactions and concluding that no ac-

---

**4.** The deductions were allowed under 26 U.S.C. § 117(g) (2).

-tual indebtednesses were created. Similarly, the profit of taxpayer in the instant case does not affect the question whether there was an actual indebtedness between him and Seaboard.

The District Court correctly found that there was in substance no valid indebtedness between taxpayer and Seaboard and its judgment dismissing the complaint is affirmed.