OPINION Raum, Judge: The only question for decision is whether a payment by petitioner in the amount of $14,128.10 to Corporate Finance Corp. (CFC) by check dated December 1, 1957, was deductible under section 168(a) of the 1954 Code as “interest paid * * * on indebtedness.”[3] It is petitioner’s position that he obtained a loan of $141,812.84 from CFC and that the payment in issue was “interest” on the “indebtedness” thus created. We hold that although the transaction was indeed cast in that form there was in fact no such bona fide “indebtedness” and that the payment did not in fact represent “interest.” The statutory language “interest * * * on indebtedness” has been defined to mean “compensation for the use or forbearance of money,” Deputy v. Dupont, 308 U.S. 488, 498, or “the amount which one has contracted to pay for the use of borrowed money,” Old Colony R. Co. v. United States, 284 U.S. 552, 560. See also Autenreith v. Commissioner, 115 F. 2d 856, 858 (C.A. 3). We are fully satisfied on this record that CFC did not make a “loan” to petitioner in the amount of $141,812.84; that, whatever may have been the legal relationships between petitioner and CFC, there was no “indebtedness” in any such amount running from petitioner to CFC; and that the $14,128.10 paid by petitioner did not represent “compensation for the use or forbearance of money.” The disallowance of the deduction is in accord with what we referred to recently in J. George Gold, 41 T.C. 419, 427, as “an ever lengthening line of decisions reaching like results in a variety of situations comparable to the one before us.” Carl Shapiro, 40 T.C. 84; Eli D. Goodstein, 30 T.C. 1178, affirmed 267 F. 2d 127 (C.A. 1); Broome v. United States, 170 F. Supp. 613 (Ct. Cl.); Sonnabend v. Commissioner, 267 F. 2d 319 (C.A. 1), affirming per curiam a Memorandum Opinion of this Court; Lynch v. Commissioner, 273 F. 2d 867 (C.A. 2), affirming 31 T.C. 990 and Leslie Julian, 31 T.C. 998; Egbert J. Miles, 31 T.C. 1001; Becker v. Commissioner, 277 F. 2d 146 (C.A. 2), affirming a Memorandum Opinion of this Court; Rubin v. United States, 304 F. 2d 766 (C.A. 7); Morris R. DeWoskin, 35 T.C. 856, appeal dismissed (C.A. 7); Perry A. Nichols, 37 T.C. 772, affirmed 314 F. 2d 337 (C.A. 5); Empire Press, Inc., 35 T.C. 136. Cf. Knetsch v. United States, 364 U.S. 361; Amor F. Pierce, 37 T.C. 1039, affirmed 311 F. 2d 894 (C.A. 9); A. A. Helwig, 37 T.C. 1046; United States v. Roderick, 290 F. 2d 823 (C.A. 5); Bridges v. Commissioner, 325 F. 2d 180 (C.A. 4), affirming 39 T.C. 1064; MacRae v. Commissioner, 294 F. 2d 56 (C.A. 9), affirming in part and remanding in part 34 T.C. 20, certiorari denied 368 U.S. 955; Kaye v. Commissioner, 287 F. 2d 40 (C.A. 9) affirming per curiam 33 T.C. 511; Weller v. Commissioner, 270 F. 2d 294 (C.A. 3), affirming 31 T.C. 33 and W. Stuart Emmons, 31 T.C. 26, certiorari denied 364 U.S. 908; William R. Lovett, 37 T.C. 317. The principal component of the alleged “indebtedness” of $141,-812.84 was an item of $116,074.86, the price for the $125,000 face amount of Treasury notes allegedly purchased by petitioner and put up by him as collateral with CFC. However, the record convincingly indicates that this was a sham. Notwithstanding documents that were impeccably correct in form, such as confirmation slips and letters of instruction involving presumably reputable brokerage firms and financial institutions, which gave the appearance of a purchase and pledge of $125,000 Treasury notes by petitioner, we are satisfied on this record that he in fact bought no such notes and never received any loan from CFC for that purpose. It does not appear that any such notes were ever under the control or dominion of petitioner or CFC for even a split second. The only exchange of funds in respect of this purported purchase was CFC’s payment of $97.66 to Childs, the difference between petitioner’s purported purchase price and the price obtained from Pressprich in a simultaneous sale. In substance, all that happened was the movement of the notes from one broker or dealer (Childs) to another (Pressprich), with an illusion that there had meanwhile been a sale of these notes to petitioner and that he had put them up with CFC as collateral to secure the loan he had obtained from CFC in order to buy the notes. This was merely documentary sleight of hand. CFC made no loan to petitioner in respect of these notes, and petitioner paid no “interest” in respect of any resulting “indebtedness.” While it is true that Traubner was successful in obtaining certain negotiable bonds from Livingstone as a “pledge” on behalf of all 15 of Traubner’s clients who had entered into like transactions, this circumstance does not change the result. It simply gave those clients protection in a bucket-shop-type transaction in respect of obtaining any ultimate increase in the value of the Treasury notes at maturity as though the clients were the owners of such Treasury notes. But that pledge could not convert into reality the clients’ ownership of any such nonexistent Treasury notes. After the smoke cleared away on November 27, 1957, there were no such notes owned by petitioner and deposited as collateral with CFC; on that day the Treasury notes moved directly from Childs to Pressprich, and there was no resting place on the way. Whatever contractual rights the clients may have had against CFC or Livingstone, no loans were in fact made to them to purchase any Treasury notes.[4] Cf. Lynch v. Commissioner, 273 F. 2d 867, 870 (C.A. 2); Rubin v. United States, 301 F. 2d 766, 770 (C.A. 7). Nor does the otherwise nonexistent “indebtedness” relating to the purported purchase of the Treasury notes become real by reason of the simultaneous purchase of corporate securities in the amount of $25,737.98 which accounted for the remainder of petitioner’s note to CFC. It is plain to us that the introduction of the corporate securities into the transaction was merely to provide window dressing for the Treasury notes. Moreover, in view of the relative amounts of corporate securities and Treasury notes involved, it was, to change the metaphor, an attempt to make the tail wag the dog, and a rather sickly tail at that. It must not be forgotten that the basic question in this case is whether petitioner in fact borrowed $141,812.84 from CFC and paid “interest” on the resulting “indebtedness.” As indicated above, it is clear that no such “indebtedness” was created in respect of the major component of tbe transaction, the Treasury notes. And even if the corporate securities were to be considered separately, there was no bona fide loan by CFC to petitioner. To be sure, petitioner had an account with Merrill Lynch, and had traded actively in securities through that account for a number of years. Further, corporate securities in the amount of $25,737.98 were actually purchased through that account in petitioner’s name. But control over those securities, along with others allocable to other clients of Traubner, was in the hands of Livingstone who, through a series of maneuvers during a comparatively short period that followed such purchase, caused the securities to be sold on the market. After December 16, 1957, no such corporate securities were in fact owned by or for petitioner, nor were any such corporate securities held by CFC as collateral for any loan to petitioner. Thus, what has been described as a “financial round robin,” Broome v. United States, 170 F. Supp. 613 (Ct. Cl.), in respect of transactions involving simultaneous purchases and sales of Government obligations, also occurred here, except that the transaction was stretched out over a comparatively short period of time. Regardless of whether Livingstone’s actions were contrary to Traubner’s understanding with Livingstone, the fact remains that no corporate securities belonging to petitioner were held thereafter by CFC in any manner as security for any loan to him. And we cannot conclude that there was any bona fide loan by CFC to petitioner. The fact that various legal rights and obligations may have been created or that Livingstone may have become liable to petitioner on some contractual basis is beside the point. Cf. Rubin v. United States, 304 F. 2d 766, 770 (C.A. 7). Indeed, as a result of pressure by Traubner, Livingstone at a considerably later time (November 1958 and November 1959) finally made arrangements for petitioner actually to acquire an equivalent amount of corporate securities at the lower prices that prevailed in November 1957 when such securities were purchased through Merrill Lynch and purportedly put up as collateral with CFC. Petitioner has made much of the fact that he thereafter sold some of these securities, reporting either capital gain or capital loss on such sales, and that he continues to hold the remaining securities. But the point in respect of the problem before us is that the securities which he thus sold or which he now owns were acquired by him in 1958 and 1959, not in November 1957. CFC did not lend him money to buy those securities. The fact that Livingstone in 1958 and 1959 enabled petitioner to obtain an equivalent amount of corporate securities at November 1957 prices does not establish that CFC made the controverted loan of $141,812.84 to petitioner or a bona fide loan in any other amount. Nor is the existence of a bona fide “loan” established by the mere fact that petitioner’s contractual relationship with Livingstone may have furnished the basis for some sort of potential “economic gain.” The question still remains whether there was in fact a bona fide loan of $141,812.84 by CFC to petitioner, and we are convinced on this record that that question must be answered in the negative. The presence of a risk of gain or loss cannot make a bona fide loan out of one that exists only on paper. Certainly, the $14,128.10 paid by petitioner did not represent “interest” on “indebtedness.” Decisions will be entered for the respondent. By amendments to their pleadings, petitioners attempted to raise two additional alternative issues, namely, that the amount in question allocable to each of them was deductible “as a loss sustained * * * in a transaction entered into for profit,” and that it was also deductible “as an ordinary and necessary expense incurred * * * for the production or collection of income.” ¡However, these additional issues were not subsequently presented to the Court at the trial, nor were they argued on brief. In the circumstances, they must be deemed to have been abandoned. Petitioner has objected to a considerable amount of evidence relating to CPC which might establish the absence of any bona fide loan. While it is true that neither petitioner nor Traubner may have been aware of all the matters covered by that evidence, it was fully competent and material to show that there was in fact no such loan or “indebtedr ness” as the one relied upon by petitioner fon his claimed deduction. Cf. Perry A. Nichols, 37 T.C. 772, 788-789, affirmed 314 F. 2d 337, 338 (C.A. 5); MacRae v. Commissioner, 294 F. 2d 56, 59 (C.A. 9), affirming in part and remanding in part 34 T.C. 20, certiorari denied 368 U.S. 955; Lynch v. Commissioner, 273 F. 2d 867, 872 (C.A. 2), affirming 31 T.C. 990 and 31 T.C. 998.