James A. DOOLEY and Virginia P. Dooley, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 14309.

United States Court of Appeals Seventh Circuit.

June 5, 1964.

Edward W. Rothe, John F. Kelly, Thomas R. Mulroy, Hopkins, Sutter, Owen, Mulroy & Wentz, Chicago, Ill., for petitioners.

Louis F. Oberdorfer, Asst. Atty. Gen., Joseph M. Howard, Atty., Tax Div., Lee A. Jackson, Gilbert E. Andrews, John M. Brant, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before DUFFY, CASTLE and SWYGERT, Circuit Judges.

DUFFY, Circuit Judge.

This is another of the so-called Livingstone cases which have been before United States Courts of Appeals in various parts of the country. We previously have considered two of these cases, viz., Rubin v. United States, 7 Cir., 304 F.2d 766 (1962) and Lewis v. Commissioner, 7 Cir., 328 F.2d 634 (1964).

M. Eli Livingstone was a Boston broker. He devised schemes or plans for re-

464

ducing personal income taxes through the device of claiming deductions for alleged payment of interest on loans to finance the purchase of government securities. Although varying in some particulars, fundamentally the schemes were quite similar.

In the case at bar, we consider four transactions between Livingstone and James A. Dooley [1] of Chicago, Illinois. The case involves individual income tax liability for taxpayer's fiscal years ending September 30, 1955 and September 30, 1956. In those years, taxpayer took deductions on his income tax returns for "interest" and "coupon expense" in respect to his purported acquisition of Treasury notes and bonds. These deductions were disallowed by the Commissioner. This action by the Commissioner was contested in the Tax Court by taxpayer who claimed in the alternative that he was entitled to income tax deductions for his out-of-pocket expenses in connection with the disputed transactions. The Tax Court affirmed the disallowance of the deductions by the Commissioner and also held that taxpayer's claimed out-of-pocket expenses were not deductible. The Tax Court determined a deficiency of $100,142.25 for the fiscal year ending September 30, 1955, and a deficiency of $33,792.61 for the fiscal year ending September 30, 1956. From such action, taxpayer prosecuted the instant petition for review.

The substance of the proposal made by Livingstone to Dooley was 1) Dooley would buy Government bonds from Livingstone at a discount. Two semi-annual interest coupons would be detached from the bonds when purchased by Dooley; 2) Livingstone would arrange a loan to cover the purchase price, using the bonds as collateral; 3) Dooley would claim an income tax deduction for prepaid interest on the loan; 4) Dooley would sell the bonds at or close to their face value at any time after the bonds had become whole again; 5) Any gain on the sale of the bonds would be claimed by Dooley as a long term capital gain.

FIRST TRANSACTION.

"PURCHASE" OF $1,000,000 OF U. S. 1⅞% NOTES.

On September 15, 1955, Livingstone sent a letter and confirmation slip to Dooley reciting a sale of $1,000,000 (face amount) of United States Treasury 1⅞% notes due February 15, 1959, with the February 15, 1956 and August 15, 1956 interest coupons detached, at 95, or a total of $950,000. The letter also granted Dooley an irrevocable option (a "put") to sell the notes to Livingstone on or after August 15, 1956, at a price of 100⅛. Livingstone deposited $50,000 in escrow with John Baker, Dooley's financial advisor, as security for performance of the "put." Dooley executed his note of $950,000 bearing interest at 3⅜% to Corporation Finance and Loan Corporation of Boston (CF&L). [2]

A provision of the note was "The undersigned gives the obligee a lien against the securities pledged for the amount of the obligations set forth herein and gives to the obligee the right to hypothecate and use the securities pledged for any purpose while so pledged."

By letter of September 15, 1955, over the signature of taxpayer, Livingstone was requested to deliver $1,000,000 (face amount), United States Treasury 1⅞% notes bearing interest at 3⅜%, to CF&L, against payment of $950,000. This letter

1. Taxpayer's wife, Virginia P. Dooley, is involved only because of having filed joint income tax returns. James A. Dooley is sometimes referred to as "taxpayer."

2. Although Livingstone was not a director or stockholder of CF&L, it appears that this was a dummy corporation set up by Livingstone to facilitate the handling of transactions such as this. CF&L was a Massachusetts corporation with only $1000 of contributed capital. Harry Cushing of Boston, a former law associate of Livingstone, was president and treasurer of CF&L. Substantially all of the business of CF&L was received on reference from Livingstone. CF&L never sought or used a credit report on any person with whom it did business.

was prepared in Livingstone's office and forwarded to taxpayer for his signature. By letter also dated September 15, 1955, over the signature of taxpayer, CF&L was requested to receive the notes from Livingstone for $950,000. This letter also was prepared in Livingstone's office.

On or about September 15, 1955, CF&L sold $1,000,000 (face amount), United States Treasury 1⅞% notes due February 15, 1959, with February 15, 1956 and August 15, 1956 coupons detached, to Salomon Bros. & Hutzler. At the time of this sale, taxpayer did not know that it had been made.

The United States Treasury notes referred to in Livingstone's letter to taxpayer dated September 15, 1955, and in the confirmation slip sent by Livingstone to taxpayer, were never in the physical possession of taxpayer, Livingstone or CF&L. This is the result of a transaction known to securities dealers as a "pair-off."

Taxpayer paid the amount of $64,364.11 to CF&L by check dated September 16, 1955. This was paid pursuant to the note which Dooley had signed the previous day, the note providing that this was prepaid interest. The balance of $46,875 was to be paid in semi-annual installments of $9,375 beginning February 15, 1957. It might be noted that the due dates and amounts of the deferred semi-annual installments coincided with the due dates and amounts of the semi-annual interest coupons remaining attached to the Treasury notes. By letter dated September 25, 1956, taxpayer requested CF&L to deliver from his account to Livingstone $1,000,000 United States Treasury 1⅞% notes due February 1, 1959 against payment from Livingstone of $952,089, and to apply the proceeds in discharge of his obligation to CF&L in the amount of $950,000 plus interest due of $2,089. A corresponding letter directing Livingstone to pay the money and receive the notes was signed by taxpayer. Both of these letters were prepared in Livingstone's office for taxpayer's signature.

On September 26, 1956, taxpayer wrote to Livingstone—"I wish to exercise the 'put' previously issued to me. Will you kindly take care of this at once."

About this same time, Dooley received a check from Livingstone for $51,250. This represented the proceeds of the exercise of the "put" of $1,003,339 less the payment of Dooley's borrowing from CF&L of $952,089. The $50,000 which Livingstone had deposited in escrow to secure his performance of the "put" was returned to Livingstone.

It should be noted that while Dooley claims a deduction of $64,364.11 as interest paid on this transaction, his net out-of-pocket expense was $13,114.11.

SECOND TRANSACTION.

"PURCHASE" OF $1,150,000 OF 1⅞%
U. S. TREASURY NOTES.

The mechanics of the second transaction were similar to those in the first transaction. On September 29, 1955, Dooley apparently bought from Livingstone $1,150,000 (face amount) of United States Treasury 1⅞% notes due February 15, 1959, with the February 15, 1956 and August 15, 1956 interest coupons detached. The total purchase price was $1,099,687.50. Dooley agreed to borrow the purchase price from CF&L on his promissory note due February 15, 1959, with stated interest at 3 3/16% per year. Dooley paid $64,785.55 by his personal check dated and delivered to Livingstone on September 29, 1955. The balance of $53,906.25 was to be paid in semi-annual installments of $10,781.25 beginning February 15, 1957.

As in the first transaction, the due dates and amounts of the deferred semi-annual interest installments coincided with the due dates and the amounts of the semi-annual interest coupons remaining attached to the Treasury notes.

The Treasury notes which were supposed to be purchased were never delivered by Livingstone to CF&L nor held by CF&L as collateral. Instead, Livingstone placed simultaneous orders with Salomon Bros. & Hutzler for 1) the purchase of

the Treasury notes for Livingstone's own account, and 2) the sale of the notes for CF&L's account, so that Salomon "paired-off" the buy and sell orders and no securities were actually delivered.

On the same day, the Treasury notes were purportedly purchased (September 29, 1955), Livingstone gave Dooley an irrevocable option (a "put") to resell the same notes to Livingstone on or after August 15, 1956, at a price of 100⅛. As security for the performance of this "put", Livingstone deposited a total of $53,000 in escrow with Baker.

As in the first transaction, in September 1956, when the "put" was apparently exercised, Dooley received a check from Livingstone for $51,750. This represented the proceeds of the exercise of the "put" of $1,153,839.84 (including $2,-402.34 interest from August 15, 1956) less the payment of Dooley's borrowing from CF&L of $1,102,089.84 (including the $2,402.34) interest. The $53,000 which Livingstone had deposited in escrow was returned to him.

Thus, in this transaction, while Dooley claims a deduction of $64,785.55 as interest paid, his net out-of-pocket expense was $13,035.55.

### THIRD TRANSACTION.

#### "SHORT SALE" OF $4,000,000 OF 2¾% U. S. TREASURY BONDS.

The purport of this transaction is that on July 12, 1956, Dooley sold short $4,-000,000 (face amount) of United States Treasury 2¾% bonds due September 15, 1961, to Salomon Bros. & Hutzler, at 99. The sale price was $3,960,000 plus accrued interest of $35,570.65. The bonds to cover the short sale were to be borrowed from Livingstone who was to arrange to have them delivered to Salomon from Livingstone's account in a New York bank, against the payment of the purchase price, crediting Dooley's account with Livingstone.

It appeared that in return for the loan of the 2¾% bonds, 1) Dooley paid Livingstone with his personal check dated July 24, 1956, the sum of $66,000 as a premium for the loan of the 2¾% bonds; 2) Dooley purchased from Livingstone $4,000,000 (face amount) of United States Treasury 2½% bonds due November 15, 1961, with the November 15, 1956 and the May 15, 1957 coupons detached, at 94¾, for a total purchase price of $3,790,000 which was charged to Dooley's account with Livingstone; 3) Dooley deposited the 2½% bonds with Livingstone as collateral for the return of the 2¾% bonds; and 4) Dooley allowed Livingstone to use the coupons remaining on the 2½% bonds together with $205,570.65 credit in Dooley's account with Livingstone to reimburse Livingstone for the loss of interest on the 2¾% bonds.

Livingstone gave Dooley an irrevocable option (a "put") to sell the 2½% bonds back to Livingstone at 100⅛ on September 15, 1961 provided the 2½% bonds were still in Livingstone's possession at that time. As security for the performance of the "put", Livingstone deposited $47,000 in escrow with Baker.

As a matter of fact, neither the 2¾% nor the 2½% bonds ever left the office of Salomon because Livingstone arranged simultaneous purchases and sales of both securities with Salomon. Thus, Livingstone had no bonds to lend to Dooley and Dooley had no proceeds from the sale of 2¾% bonds to purchase 2½% bonds from Livingstone.

With regard to this transaction, Dooley claims deductions of $66,000 in bond "premium" paid to Livingstone and $19,-429.35 which was charged to Dooley's account to cover the interest differential on the bonds. Since the $47,000 placed in escrow by Livingstone was turned over to Dooley about six months after being placed in escrow, Dooley's actual involvement was only $19,000.

### FOURTH TRANSACTION.

#### "PURCHASE" OF $250,000 OF 2½% U. S. TREASURY BONDS.

On September 24, 1956, Dooley apparently bought from Livingstone $250,000 (face amount) of United States Treasury

2½% bonds due November 15, 1961, with the November 15, 1956 and May 15, 1957 coupons detached. Pursuant to arrangements made by Livingstone, Dooley agreed to borrow the $232,500 purchase price from the South Side Bank and Trust Company of Chicago, on his promissory note dated September 25, 1956, due November 15, 1961, with interest at 4%.

Dooley paid the amount of $19,692.51 to South Side by check dated and delivered to Livingstone on September 27, 1956. The balance of the stated total interest charge of $47,851.51 was to be paid through assignment by Dooley to the bank of all of the interest coupons remaining attached to the bonds.

Dooley's promissory note was secured by a pledge to the bank of the 2½% bonds. Dooley had instructed Livingstone to deliver the bonds to his account at the bank against payment of $232,500, and had instructed the bank to pay Livingstone $232,500 upon receipt of the bonds for his account. However, the bonds were never delivered to the bank by Livingstone who arranged to have CF&L buy Dooley's loan (including the collateral) from the bank on October 9, 1956.

From Dooley's payment of $19,692.51, South Side deducted $1,301.66 as "interest, service charge and reimbursement of attendant expense," and credited the account of CF&L for $18,390.85 for "balance of unearned interest due to Corporate Finance & Loan Corp. * * *" Livingstone also placed simultaneous orders with C. F. Childs & Co., bond dealers for 1) purchase of the bonds for Livingstone's own account, and 2) sale of the bonds for CF&L's account. Thus no securities were actually delivered due to the "pair-off."

The Tax Court's findings are in great detail and take up twenty-five pages of the printed appendix. We have felt it necessary to set forth in this opinion the four transactions in considerable detail in spite of the fact the transactions arranged by Livingstone here are similar in many respects to the transactions which have been set forth and described in some detail in court opinions in other Livingstone cases.

Taxpayer's counsel claims that in no other Livingstone case has the trial court's findings been so favorable to the taxpayer. It is also argued that here, interest was actually paid based upon transactions entered into at arms length. It is also emphasized that Dooley entered into the transactions only after an investigation of Livingstone and conferring with his investment adviser, John F. Baker, Chicago Securities Dealer.

Comments with reference to the Livingstone transactions which we made in Rubin v. United States, supra, and in Lewis v. C. I. R., supra, are pertinent here. Quoting from MacRae v. C. I. R., 34 T.C. 20, 26, affirmed, 9 Cir., 294 F.2d 56, we pointed out (in Rubin, 304 F.2d at 770; in Lewis, 328 F.2d at 641) that although each of the steps was, in itself, a legitimate commercial operation, taken together they were merely mirror images and added up to zero. We quoted, "The choice of the more complicated and involved method of doing nothing had no purpose, save the erection of the facade upon which petitioners now seek to rely."

Section 163(a) of the Internal Revenue Code of 1954 permits a deduction for "interest * * * on indebtedness." Interest means an amount paid "for the use of borrowed money." Old Colony R. Co. v. Commissioner, 284 U.S. 552, 560, 52 S.Ct. 211, 214, 76 L.Ed. 484, and "compensation for the use or forbearance of money." Deputy v. Du Pont, 308 U.S. 488, 498, 60 S.Ct. 363, 368, 84 L.Ed. 416.

Petitioners and respondent have each cited Knetsch v. United States, 364 U.S. 361, 81 S.Ct. 132, 5 L.Ed.2d 128. There, the taxpayer paid "interest" to a life insurance company on a loan used to purchase a single premium annuity policy. The Supreme Court analyzed the transaction in terms of "what was done," finding that there was no significant economic benefit flowing to the taxpayer. The Supreme Court stated, 364 U.S. at page 366, 81 S.Ct. at page 135, " * * *

it is patent there was nothing of substance to be realized by Knetsch from this transaction beyond a tax deduction." The Supreme Court termed the transaction a "sham" and disallowed the deduction.

■ In the case at bar, taxpayer purported to pay interest on "loans" made to him by CF&L for the purchase of Treasury notes and bonds. What happened was that the securities purportedly purchased for taxpayer's account and held as collateral for his loan, were simultaneously sold to cover the purchase. It is difficult to ascertain where this was of any economic benefit to the taxpayer. In fact, CF&L had no funds to lend taxpayer in any event. The transactions in this case are very similar to those in Rubin v. United States, supra, where this type of transaction was held to be no basis for claiming interest deductions. We see no good reason for retreating from our decision in Rubin. In fact, we approved Rubin in Lewis v. C. I. R. supra, and we now do so again.

The principal argument of taxpayer as to why, in this case, a result different from previous Livingstone cases should result, is that the various transactions were not "collusive shams" because taxpayer had no knowledge that Livingstone had not used the bonds and notes as he had agreed. Similar arguments were made and overruled in MacRae v. C. I. R., 9 Cir., 294 F.2d 56; Nichols v. C. I. R., 5 Cir., 314 F.2d 337, and Gheen v. C. I. R., 6 Cir., 331 F.2d 470.

In Lynch v. C. I. R., 273 F.2d 867, 872, the Second Circuit Court of Appeals said: " * * * Save in those instances where the statute itself turns on intent, a matter so real as taxation must depend on objective realities, not on the varying subjective beliefs of individual taxpayers." We agree.

As we have heretofore indicated, three of the four transactions in this case involved alleged payments of interest which do not qualify for income tax deductions under Section 163(a) of the 1954 Code.

The third transaction pertaining to the $4,000,000 Treasury bonds is what is known as a "straddle." However, petitioner claims that he was in a position to profit on fluctuations in the market price of the bonds.

Section 212 of the 1954 Code provides for a deduction of "all the ordinary and necessary expenses * * * 1) for the production or collection of income; 2) for the management, conservation, or maintenance of property held for the production of income."

■ What actually happened in the third transaction is that neither the 2¾% bonds nor the 2½% bonds ever left Salomon's office. They were never in the possession of taxpayer or Livingstone. Hence Livingstone had no bonds to lend to taxpayer, and taxpayer had no proceeds from the sale of the 2¾% bonds to purchase the 2½% bonds from Livingstone. It is obvious that taxpayer's possibility of profit was illusory.

■ Furthermore, this Court in Lewis v. Commissioner, supra, on very similar facts, held the so-called "premiums" paid for the asserted borrowing of bonds to cover a short sale, and other expenses with respect to the short sale, are not deductible under Section 212 of the 1954 Code.

■ Taxpayer argues finally that, in any event, his out-of-pocket expenses are deductible as fees paid for tax counsel under Section 212(3) as "ordinary and necessary expenses * * * in connection with the determination, collection, or refund of any tax." The regulation interpreting this section provides that expenses for tax counsel as well as expenses incurred in contesting a tax liability, are deductible. Regs. § 1.212–1(*l*).

It seems somewhat incongruous that fees paid to Livingstone to set up the transactions hereinbefore described, should be paid to him as "tax counsel." In the Tax Court, taxpayer contended these same amounts were deductible as "theft losses." Taxpayer does not make such a claim on this review

We agree with the Tax Court that taxpayer's out-of-pocket expenses are not deductible under Section 212(3).

We think the decision of the Tax Court was correct.

Affirmed.