**Sammy CAHN and Gloria Cahn, Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**Nos. 19417, 19418.**

United States Court of Appeals Ninth Circuit.

April 4, 1966.

Chambers, Circuit Judge, dissented.

———◆———

Hilbert P. Zarky, Irving I. Axelrad, Edward R. McHale, of Mitchell, Silberberg & Knupp, Los Angeles, Cal., for petitioners.

Louis P. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Robert N. Anderson, Jeanine Jacobs, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before CHAMBERS and BARNES, Circuit Judges, and FOLEY, Jr., District Judge.

BARNES, Circuit Judge:

These are petitions to review an opinion of the Tax Court which affirmed the determination of deficiencies in both of the taxpayers' returns for the year 1957. Involved is another variant of the oft-litigated plan for reducing income taxes by deductions for the alleged payment of interest on loans to finance security purchases. The plan, devised by the self-styled Boston financier, M. Eli Livingstone, has been consistently rejected by the courts because no genuine indebtedness was demonstrated to exist. In the absence of a showing that interest was paid for the use or forbearance of money, no interest expense deduction has been permitted under Section 163 of the Internal Revenue Code of 1954. Rubin v. United States, 304 F.2d 766 (7th Cir. 1962); Becker v. C. I. R., 277 F.2d 146 (2d Cir. 1960); Lynch v. C.I.R., 273 F.2d 867 (2d Cir. 1959); Goodstein v. C.I.R., 267 F.2d 127 (1st Cir. 1959); Broome v. United States, 170 F.Supp. 613, 145 Ct.Cl. 298 (1959). A plethora of other cases exist in which Mr. Livingstone was not directly involved, but which attempted to utilize plans comparable to Livingstone's. See e. g., MacRae v. C.I.R., 294 F.2d 56 (9th Cir. 1961).

In light of the full statement of the facts and claims contained in the Tax Court opinion, 41 T.C. 858 (1964); (C.T. pp. 49–87) and since the basic elements of the plan have been discussed in the cases cited above, a summary outline of the transactions involved in the present case should suffice:

(1) Edward Traubner, president and chief executive officer of Edward Traubner & Company, Inc., a Beverly Hills, California, management firm, negotiated in behalf of petitioners and others of his clients to obtain loans from Livingstone

and the paper finance companies he dominated.

(2) An agreement was reached whereby a Livingstone controlled company, Corporate Finance Corporation, would allegedly loan $2,500,000 to the Traubner group to finance the purchase of Treasury notes and corporate securities. For every $125,000 face amount of notes, Traubner's group would be permitted to invest in $25,000 of corporate securities.

(3) All of Traubner's clients executed promissory notes to Corporate Finance Corporation for their pro rata shares of the total purchase, and *"interest payments" were prepaid to cover the financing charges. These payments are the subject of the current controversy.*

(4) The individual steps involved in taxpayers' purported purchase of the Treasury notes were as follows:

On November 21, 1957, taxpayer purportedly purchased $125,000 principal amount of Treasury notes from C. F. Childs & Company, Inc., a New York securities dealer. The total purchase price was $116,074.86, with a payment and delivery date of November 27, 1957.

Taxpayer by letter of November 22, 1957, instructed Corporate Finance Corporation to receive the Treasury notes from Childs in return for the purchase price.

On November 21, 1957, R. W. Pressprich & Company, a New York securities dealer, confirmed the purchase from Corporate Finance of the same Treasury notes at a total price of $115,977.20. The confirmation also bore a settlement date of November 27, 1957.

Corporate Finance, by letter of November 22, 1957, instructed Childs to deliver the notes to Pressprich against payment of $115,977.20. The letter stated that $97.66 (the difference between the alleged purchase price paid by taxpayer and the selling price to Pressprich) was being forwarded to Childs' Boston office.

Corporate Finance, by letter of November 22, 1957, instructed Pressprich to receive the notes against payment to Childs of $115,977.20.

All correspondence by taxpayer and Corporate Finance in respect of the Treasury notes transaction was prepared by Livingstone or his organization.

The substance of this transaction was as stated by respondent in his brief at pages 12–13:

"The identical Treasury notes purportedly purchased by taxpayer from Childs were the ones purportedly sold by CFC to Pressprich. It does not appear that there was one moment in time when either taxpayer or CFC had any control over the notes. In substance, the notes were transferred directly from Childs to Pressprich, the true purchaser thereof, but the transaction was carried out in such manner as to give the appearance of an intermediate sale of the notes to taxpayer and thus to furnish the basis for an alleged loan by CFC to finance such alleged purchase by taxpayer. In fact there was no such purchase of notes by taxpayer and there was no such loan by CFC in respect thereto. The only transfer of funds was $97.66 forwarded by CFC to Childs."

(5) The transactions involving the corporate securities are described at length in the opinion of the Tax Court. Although somewhat more circuitous than the notes transaction, the substance again involved no outlay of funds by Corporate Finance to finance the purported purchase of securities by the taxpayers.

Taxpayers seek to distinguish the present case from those prior cases involving the Livingstone plan which denied an interest deduction. The grounds for distinction rest essentially in the following:

1. Subsequent to 1957, the taxpayers had the contractual right to demand delivery of the notes or securities from Corporate Finance at the November 1957 prices.

2. The transaction possessed commercial reality since it was entered into for profit and the risk of loss or gain fell upon the taxpayers.

3. The taxpayers allegedly entered into the transaction in good faith and had

no idea that Corporate Finance was not actually purchasing the notes and securities in the names of the taxpayers.

We do not see how any of the above factors is a compelling reason for allowance of an interest deduction for the alleged "interest" payments made by taxpayers to Corporate Finance. The above factors may afford a basis for legal action by the taxpayers against Corporate Finance, but this is not relevant to the issue presently before us. The only question for our consideration is whether a payment by petitioners to Corporate Finance was "interest paid * * * on indebtedness" within the meaning of Section 163(a) of the Internal Revenue Code of 1954.

The United States Supreme Court has adhered to the position that "interest * * * on indebtedness" means "compensation for the use or forbearance of money." Deputy v. DuPont, 308 U.S. 488, 498, 60 S.Ct. 363, 368, 84 L.Ed. 416 (1940). The facts in the present case indicate that no matter what the good intent of the taxpayers may have been or what legal rights the taxpayers possessed against Corporate Finance, no *loan* was made by Corporate Finance to the taxpayers; the $14,128.10 paid by the petitioners did not represent "compensation for the use or forbearance of money." The Treasury notes in question were never under the dominion or control of either taxpayers or Corporate Finance. The series of transactions was in effect nothing more than a smokescreen for the sale of notes from Childs to Pressprich. There was no bona fide loan from Corporate Finance to petitioners.

The use of corporate securities did not change these transactions from what was described in Broome v. United States, supra, as a "financial round robin." The corporate securities involved were sold by the Livingstone group less than a month after they were purchased. And during the period of maneuvers involving the securities, the securities were never owned by or for petitioners, nor were they held by Corporate Finance as collateral for any loan to petitioner.

We agree completely with the conclusions of the Tax Court opinion:

"The fact that various legal rights and obligations may have been created or that Livingstone may have become liable to petitioner on some contractual basis is beside the point. Cf. Rubin v. United States, 304 F.2d 766, 770 (C.A. 7). Indeed, as a result of pressure by Traubner, Livingstone at a considerably later time (November 1958 and November 1959) finally made arrangements for petitioner actually to acquire an equivalent amount of corporate securities at the lower prices that prevailed in November 1957 when such securities were purchased through Merrill Lynch and purportedly put up as collateral with CFC. Petitioner has made much of the fact that he thereafter sold some of these securities, reporting either capital gain or capital loss on such sales, and that he continues to hold the remaining securities. But the point in respect of the problem before us is that the securities which he thus sold or which he now owns were acquired by him in 1958 and 1959, *not in November 1957*. CFC did not lend him money to buy *those* securities. The fact that Livingstone in 1958 and 1959 enabled petitioner to obtain an equivalent amount of corporate securities at November 1957 prices does not establish that CFC made the controverted loan of $141,812.84 to petitioner or a bona fide loan in any other amount. Nor is the existence of a bona fide 'loan' established by the mere fact that petitioner's contractual relationship with Livingstone may have furnished the basis for some sort of potential 'economic gain'. The question still remains whether there was in fact a bona fide loan of $141,812.84 by CFC to petitioner, and we are convinced on this record that that question must be answered in the negative. The presence of a risk of gain or loss cannot make a bona fide loan out of one that exists only on paper. Certainly, the $14,128.10 paid by petitioner did not

represent 'interest' on 'indebtedness'." (41 T.C. at 876–877.)

The decision of the Tax Court is affirmed.

CHAMBERS, Circuit Judge (dissenting):

The taxpayers seek through the device of adding corporate securities to a bundle of treasury notes [1] to get a deduction for the whole package of interest on the loan made for the purchase. Similarly the government goes for all or nothing. It has won completely in the tax court and here.

This case does raise, in a very cogent way, the question of whether the whole previous line of Livingstone cases is correctly decided or decided on the right theories. It may be that the courts did step in to fill a gap that should have been left for the Congress. But on the principle of stare decisis, and possibly on reason, I would accept the standing line of Livingstone cases and apply them to the proportionate part of the interest here allocable to the treasury notes. Then I would turn around and allow the deduction for interest allocable to the purchase of the securities other than treasury notes.

I would have no trouble allowing all of the interest if the transaction were all corporate securities. Interest that was paid on a legal bet (which so many business transactions are) ought to be deductible when a substantial risk was involved as it was on the corporate securities.

Taxpayers actually paid $14,218.10 as interest at the threshold. They got many corporate securities [2] in the end and they got some lawsuits with Livingstone. Apparently there is a profit on the securities to the Cahns. Will the government claim its share of the profit from the Cahns on the corporate securities they have sold and others they may sell at a profit? It would seem odd for it to do so when we hold the deal was a sham.

As indicated, I would not in the vernacular "go for broke" with either the taxpayers or the government.

1. On the treasury notes the plan was to buy in 1957 notes at the market of about $92.00 a hundred. The notes would mature in 1962. Hopefully, the Cahns at or about maturity would get a good capital gain subject to lower income tax rates than that for his professional earnings. Meanwhile, they hoped to take the interest cost of the transaction as a 100 per cent deduction. This would reduce their ordinary income in their very high brackets. If success taxwise could have been guaranteed, it was a fine idea.

2. The ratio was $125,000 of treasury notes to approximately $25,000 of corporate securities, or five to one.