GORDON MACRAE AND SHEILA MACRAE, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

ALBERT GORDON MACRAE AND SHEILA MACRAE, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 61091, 67789.   Filed April 12, 1960.

*Bernard Speisman, Esq.*, and *Jerald S. Schutzbank, Esq.*, for the petitioners.

*Mark Townsend, Esq.*, and *Michael P. McLeod, Esq.*, for the respondent.

FORRESTER, *Judge:* Respondent has determined deficiencies and an addition in the income tax of petitioners for the calendar years 1952 and 1953 as follows:

| Year | Deficiency | Addition Sec. 294(d)(2) |
|---|---|---|
| 1952 | $23,998.38 | _____ |
| 1953 | 109,768.42 | $6,172.19 |

Petitioners raise no separate contentions with respect to the addition for 1953; consequently, the sole issue remaining is the deductibility of certain purported interest payments.

### FINDINGS OF FACT.

The stipulated facts are so found.

At all times material petitioners have been husband and wife residing in Beverly Hills, California. Their joint income tax returns for the calendar years 1952 and 1953 were filed on the cash basis with the director of internal revenue at Los Angeles. Gordon MacRae, also known as Albert Gordon MacRae, will be referred to as the petitioner.

Petitioner is a well-known entertainer. Prior to the years in question he had made no substantial investments in securities. His business and financial matters were handled for him by his attorneys.

B. Gerald Cantor has at all times material been president of Cantor, Fitzgerald & Co., Inc. (hereinafter called C-F), brokers and dealers in securities. In December of 1952, Cantor and petitioner's attorneys discussed the possibility that some of the latters' clients might purchase substantial face amounts of United States Treasury notes (hereinafter called notes) with a minimal downpayment, using borrowed funds for the bulk of the purchase price.

Shortly thereafter, one of petitioner's attorneys advised him that he could purchase $1 million in notes primarily with borrowed money, and that the interest on the loan would be a "good tax deduction." Petitioner was further advised that a profit reportable as a capital gain was possible, and that the loan could be made on a nonrecourse basis.

Petitioner did not seek further details. He did not know nor did he inquire as to the interest rate required on the loan, the rate of return on the notes, or the possibility of profit or loss on the entire transaction apart from tax considerations. His principal purpose in agreeing thereto was the creation of a deduction for tax purposes.

On December 19, 1952, with settlement date of December 26, petitioner placed with C-F an order to purchase for his account 1⅜ per cent notes, maturing March 15, 1954, in the face amount of $1 million. The confirmation slip of C-F showed the price as $992,500, with accrued interest of $3,874.31. Thereupon, petitioner (1) issued a check in the amount of $3,874.31, which C-F received on or about December 26, 1952, and (2) executed and delivered to C-F his promissory note in the amount of $992,500, dated December 26, 1952, and due March 15, 1954, with interest at 2½ per cent per annum.

Petitioner's note was without personal liability. It was limited to the collateral security, consisting of the notes. It provided that petitioner might sell the notes at any time, and discharge the indebtedness by payment of the net proceeds received. He might also anticipate payment by paying additional interest of one-half per cent per annum prorated to the maturity date of March 15, 1954. The note contained the following provision:

The undersigned has paid the interest, due and to be due hereunder, concurrently with the execution hereof, and hereby gives obligee a lien against the securities pledged for the principal amount of the indebtedness set forth herein, and obligee may re-hypothecate or borrow the said securities, provided, however, that such re-hypothecation or borrowing shall not be inconsistent in any manner with the ownership by the undersigned of said securities. Undersigned shall have the right to obtain the return of said securities in kind at any time upon tender of payment of the principal indebtedness due hereunder.

When petitioner placed his above order with C-F, the latter had no notes in inventory. On December 26, 1952, C-F went through the mechanics of both buying and selling $2 million in such notes, which amount included the $1 million ordered by petitioner. At the close of business on December 26, 1952, C-F's inventory did not include any notes.

The transaction whereby C-F bought and sold the notes was as follows: C-F arranged a purchase from and sale to C. F. Childs (hereinafter called Childs), a dealer in securities, to be effected the same day. Carl M. Loeb Rhoads & Co., Inc. (hereinafter called

Rhoads), acted as clearance agent. Pursuant to instructions from C-F, Rhoads received the notes against payment to Childs, and on the same day redelivered them to Childs against payment from the latter. C-F was charged a clearance fee and any differential between the purchase and sale prices.

The sale to Childs constituted a "borrowing" by C-F of the notes in accordance with the above-quoted provision of petitioner's note, a common practice among dealers and brokers in securities.

On December 26, 1952, petitioner issued to C-F a check in the amount of $30,257.42, purportedly as interest to March 15, 1954.

The Gibraltar Financial Corporation (hereinafter called Gibraltar) was incorporated on or about December 24, 1952. Initial working capital consisted of $1,500 in borrowed money and $2,000 of capital investment paid in on December 29, 1952. No further capital was invested in Gibraltar at any time pertinent.

For the period December 24 to December 31, 1952, Gibraltar's records reflect loans to customers in the amount of $17 million, with another $17 million in such loans for the following month. The first such loan, in the amount of $1,020,000, is recorded as being made December 26, 1952. All "loans" listed on Gibraltar's books during the period here in issue arose through transactions similar to those of petitioner, as hereinafter described.

Gibraltar's balance sheet was as follows on the dates shown below:

### THE GIBRALTAR FINANCIAL CORPORATION BALANCE SHEET

| | Dec. 24, 1952 (date of incorporation) | Dec. 1, 1953 |
|---|---|---|
| Assets: | | |
| Cash in banks | $2,000 | $23,913.88 |
| Notes and accounts receivable | | 126,609,019.61 |
| Securities owned—long | | 20,158.68 |
| Other assets | | 1,084.53 |
| Total | 2,000 | 126,655,076.70 |
| Liabilities: | | |
| Accounts payable | | 15,706.75 |
| Accrued expenses—taxes | | 17,058.42 |
| Securities borrowed | | 126,623,456.20 |
| Capital stock | 2,000 | 2,000.00 |
| Deficit | | (3,144.67) |
| Total | 2,000 | 126,655,076.70 |

On or about January 26, 1953, petitioner's purported loan owing to C-F was refinanced through Gibraltar, petitioner executing a new note. Under its terms, Gibraltar was substituted for C-F as payee, the nonrecourse feature was eliminated, the interest rate was reduced from 2.5 per cent to 2.42 per cent, the amount of the "loan" was increased from $992,500 to $1,020,000 (face value of the notes plus interest coupons), and the right to a refund of a portion of interest upon prepayment was eliminated.

On the same day, petitioner issued his check to C-F, as correspondent for Gibraltar, in the amount of $27,930.11, purportedly as interest to March 15, 1954, on the new note. At the same time, he received a check from C-F in the amount of $28,082.08, as refund of interest on cancellation of the old note.

Under the terms of the new note, the $1 million in notes was pledged as collateral security. In accordance with this arrangement, petitioner directed C-F to deliver the notes to Gibraltar against payment of $1,020,000. C-F did not then have the notes, and the transfer of the notes and liability was accomplished by book entries of C-F and Gibraltar.

On August 12, 1953, petitioner purported to sell the notes to C-F at a total price of $1,001,891.98, including accrued interest in the amount of $5,641.98. He authorized C-F to receive the notes from Gibraltar against payment, and on the same day instructed Gibraltar to deliver the notes to C-F against payment.

Pursuant to petitioner's instructions, Gibraltar placed an order with Guaranty Trust Company of New York (hereinafter called Guaranty) dated August 12 with settlement date of August 13, 1953, for $1 million in notes at a total purchase price, including accrued interest, in the amount of $1,002,204.48, to be delivered to Irving Trust Company (hereinafter called Irving) as clearance agent. At the same time, Gibraltar instructed Irving to receive the notes from Guaranty against payment of $1,002,204.48, and to deliver $1 million in notes to the Chemical Bank & Trust Company (hereinafter called Chemical) as clearance agent for C-F against payment of $1,001,891.98.

At the same time as it agreed to purchase $1 million in notes from petitioner, C-F also arranged to sell the notes to Chemical in two lots of $500,000 each. C-F instructed Chemical as clearance agent to receive $1 million in notes from Irving, which was acting as Gibraltar's clearance agent, against payment of $1,001,891.98, and to deliver the same amount in notes to the bond department of Chemical against payment of $1,002,126.36.

As a result of the foregoing, Gibraltar and C-F were charged by their respective clearance agents with the clearance fee and the difference between the buy and sell prices. The only substantial moneys or credit utilized belonged to the clearance agents, whose willingness to use their funds or credit was attributable to the fact that they held instructions to deliver as well as to receive against payment, and that, apart from the comparatively nominal clearance fee and difference between buy and sell prices, no risk existed.

On March 10, 1953, petitioner entered into a transaction as follows:

On March 10, with settlement date of March 11, petitioner ordered

C-F to purchase for his account $2 million face amount 1¾ per cent Federal Land Bank bonds (hereinafter called bonds), due October 1, 1955–1957, and to deliver them to Gibraltar against payment of $1,925,555.56, the price of C-F's purchase. Thereupon, petitioner executed and delivered to Gibraltar his full-recourse promissory note in the amount of $2,104,000, bearing interest at the rate of 4¼ per cent per annum, payable October 1, 1955, and renewable to October 1, 1957, with interest at the rate of 2¼ per cent per annum for any such extended period.

The note recited that petitioner had pledged the bonds with Gibraltar as collateral security, and that $178,444.44 of the principal amount of the note would be withheld as security for interest, to be released as interest payments were made. Prepayment to September 1, 1955, was permitted at the rate of 1½ per cent from date of prepayment to maturity.

On March 10, 1953, C-F arranged a purchase of $2 million face amount of bonds from Childs with settlement date of March 11, at a price of $1,924,305.56, and instructed Chemical as clearance agent to receive the bonds against payment. On the same day, C-F instructed Chemical to deliver the bonds against payment in the amount of $1,925,555.56 to Irving as clearance agent for Gibraltar. In turn, Gibraltar instructed Irving to receive the bonds from Chemical against payment of $1,925,555.56 and to deliver them on the same day to Childs against payment of $1,923,680.56.

As a result of the foregoing, C-F and Gibraltar were charged clearance fees and the difference between the respective buy and sell prices. Two million dollars face amount of bonds were bought from and sold to Childs on the same day, and neither C-F nor Gibraltar ever actually received possession thereof.

On August 13, 1953, and October 30, 1953, petitioner entered into essentially similar transactions involving $1 million face amount United States Treasury notes 1¾ per cent due December 15, 1955, and $1 million face amount United States Treasury notes 1½ per cent due April 1, 1958, respectively. Petitioner executed and delivered to Gibraltar full-recourse notes similar to that covering the bond transaction, in the respective principal amounts of $1,043,250 with interest at 2⅞ per cent and an interest reserve of $54,178.96, and $1,067,000 with interest at 2¾ per cent and an interest reserve of $94,554.95. Subsequent to the taxable years in issue petitioner closed out these transactions as well as that respecting the bonds in essentially the same manner as already described with respect to the notes.

During 1952 and 1953, petitioner issued checks to C-F, purportedly as interest payments, as follows:

Checks Issued by Petitioner, Gordon MacRae, During the Years 1952 and 1953 to Cantor, Fitzgerald & Co., Inc. and Deducted in the 1952 and 1953 Income Tax Returns.

| Date | Check No. | Total amount | Alleged loans dated | | | | | Miscellaneous |
| | | | Dec. 26, 1952 | Jan. 26, 1953 | Mar. 11, 1953 | Aug. 13, 1953 | Oct. 30, 1953 | |
|---|---|---|---|---|---|---|---|---|
| *1952* | | | | | | | | |
| Dec. 26 | 2079 | $30,257.42 | $30,257.42 | | | | | |
| Total claimed in return | | 30,257.42 | 30,257.42 | | | | | |
| *1953* | | | | | | | | |
| Jan. 26 | 2259 | 27,930.11 | | $27,930.11 | | | | |
| Jan. 26 | Refund | (28,082.08) | (28,082.08) | | | | | |
| Mar. 9 | 2396 | 11,599.77 | | | $11,599.77 | | | |
| June 4 | 2735 | 11,599.77 | | | 11,599.77 | | | |
| Aug. 12 | 3034 | 28,474.29 | | | | $28,474.29 | | |
| Aug. 12 | Refund | (14,285.34) | | (14,285.34) | | | | |
| Aug. 26 | 3079 | 11,599.77 | | | 11,599.77 | | | |
| Dec. 4 | 3420 | 11,599.77 | | | 11,599.77 | | | |
| Dec. 17 | 3464 | 69,598.62 | | | 69,598.62 | | | |
| Dec. 23 | 3491 | 2,631.43 | | | | | $2,631.43 | |
| Miscellaneous adjustment | | (33.99) | | | | | | ($33.99) |
| Total claimed in return | | 132,632,12 | (28,082.08) | 13,644.77 | 115,997.70 | 28,474.29 | 2,631.43 | (33.99) |

The first check, in the amount of $30,257.42, dated December 26, 1952, was received by C-F for its own account. The remaining checks were received for the account of Gibraltar.

In 1953 petitioner received various amounts from C-F, both on its own and on Gibraltar's account, purportedly as interest, a refund of interest, the balance due on a sale of notes, and a refund of excess loan funds.

Petitioner reported $34,094.82 in his 1953 return as interest income, and $1,562.50 as 50 per cent of capital gain upon sale of the notes.

The original note of petitioner dated December 26, 1952, was without recourse because petitioner was concerned over a note of such size. Thereafter his legal and business advisers were able to assure him that in reality no risk existed, and all later notes were with recourse. This recourse feature permitted a slightly lower rate of interest, but its principal purpose was to strengthen petitioner's legal position in the event the deductibility of purported interest payments should be challenged.

Gibraltar did not at any time have possession of any notes or bonds, and consequently did not receive interest thereon. Its books do not reflect such interest receipts, but do credit petitioner with the amount of interest which he would have received as a holder.

Petitioner at no material time intended to borrow money from C-F or Gibraltar, or to purchase securities with their assistance. Nor

did C-F or Gibraltar ever intend to lend any amount to petitioner. The intent and purpose of all parties concerned was the creation of a deduction for tax purposes, through a transaction which in form would appear to create an indebtedness but which in fact was lacking in substance.

### OPINION.

After careful review of the foregoing facts, we find the instant proceeding indistinguishable in principle from *Eli D. Goodstein*, 30 T.C. 1178, affd. 267 F. 2d 127 (C.A. 1). Cf., also, *Knetsch* v. *United States*, 272 F. 2d 200 (C.A. 9), certiorari granted (Feb. 23, 1960) ; *Danny Kaye*, 33 T.C. 511, on appeal (C.A. 9) ; *George G. Lynch*, 31 T.C. 990, affd. 273 F. 2d 867 (C.A. 2) ; *W. Stuart Emmons*, 31 T.C. 26, affirmed sub nom. *Weller* v. *Commissioner*, 270 F. 2d 294 (C.A. 3) ; *Broome* v. *United States*, 170 F. Supp. 613 (Ct. Cl., 1959) ; *Haggard* v. *United States*, an unreported case (D. Ariz., Feb. 17, 1959).

To be sure, formal appearances have been given more artistic attention in the instant case than in any prior proceeding, and petitioners rely heavily on this greater perfection of form. We discern no difference in substance, however. The results in the cited cases were obtained because the substance of each of the respective transactions differed from its form; petitioners here are not aided because this divergence is even greater in their case.

Petitioners may prevail only if the payments in question were in fact and in substance interest, i.e., consideration paid for the use or forbearance of money. Cf. *Deputy* v. *DuPont*, 308 U.S. 488. The only money used here belonged to the banks acting as clearance agents. These funds were used for a short period (less than one day), and the banks were paid in full therefor, when they received their clearance fees. Gibraltar, the alleged recipient of most of the so-called interest payments, had no money, and neither it nor C-F forbore or permitted the use thereof, as a result of the "financial round robins" in which the parties engaged. Cf. *Broome* v. *United States, supra.*

To be sure, each step taken, if viewed separately, constituted a normal business activity, similar to many real and substantial transactions consummated on any given business day. But we may not thus fragmentize the transactions here under consideration and view each step thereof as though independent of those which went before and those which followed.

On any normal day of business some persons will buy and others will sell securities. Persons will borrow to effect purchases, and dealers and brokers will hold securities as collateral and, when necessary, borrow securities so held to cover short sales. Lending institutions normally lend many times their actual capital.

But these observations lose significance in the context of the transactions now before us. The steps taken, each in itself a legitimate commercial operation, were here each mirror images, and add up to zero. The various purchases and sales, each real *without the other*, neutralize one another and fairly shout to the world the essential nullity of what was done. No purchase and no sale is essentially identical with what was done here, i.e., identical and virtually simultaneous purchases and sales. The choice of the more complicated and involved method of doing nothing had no purpose, save the erection of the facade upon which petitioners now seek to rely.

We think appropriate here the following language from the opinion of the Court of Appeals for the First Circuit affirming our decision in *Goodstein, supra*, at page 131:

Moreover, we are convinced that following the transactions of October 27, 1952, there existed no indebtedness from the taxpayer to Seaboard. Despite the transitory possession by the Guaranty Trust Company of the Treasury notes for Livingstone's account who was acting as the taxpayer's agent, there was never in substance either a purchase of the notes by the taxpayer or borrowing of the purchase funds from Seaboard. However, it would seem that these transactions did create a legal relationship between the taxpayer and Seaboard, but it was not one of borrower and lender. Rather the net result of these transactions was the exchange of promises of future performances between the taxpayer and Seaboard. The taxpayer promised to pay Seaboard a certain preascertained sum of money on March 15, 1954 or at any time before that date which he may select. Seaboard in return promised to acquire and deliver to the taxpayer on the date so selected $10,000,000 face value of 1⅜% United States Treasury notes maturing on March 15, 1954 with interest accrued from the date of the contract.

Petitioners urge that they had no actual knowledge of the mechanics of the transactions as undertaken by C-F and Gibraltar, and we believe this to be true. We disposed of this point in the *Goodstein* case by the following language at page 1188:

We think it obvious from the whole record that all the steps taken were pursuant to a preconceived plan which lacked substance and which was entered into solely to form the basis for a claimed tax benefit. The actual purchase by Livingstone of $10,000,000 face amount of Treasury notes was consummated only to give color to the transaction, and, as pointed out, these notes were disposed of immediately. We think it apparent that it was the intention of all the three participants that the petitioner would not purchase the Treasury notes, that there would be no actual loan to the petitioner, and that he would not pay any interest. He did not risk any borrowed money. The only amount he actually paid out and risked was the $15,000.

The petitioner, in an attempt to show that he was not party to a prearranged plan, testified that he did not give an order for the sale of the Treasury notes, and that he did not know of the sale at the time it occurred. However, the evidence shows that he did, in preliminary conferences, discuss the proposed transaction with M. Eli Livingstone, including the tax consequences, and that in his note given to Seaboard he authorized Seaboard to use

the securities. Accordingly, any action taken must be considered to have been at least with his acquiescence.

In any event, regardless of petitioners' ignorance of the actual steps taken, they may deduct the amounts in question as interest only if they were in fact paid as interest on an existing indebtedness, which they intended in good faith to create. These payments do not fit such description. They were in reality the net consideration paid not for a loan, but for a tax deduction, and so viewed are plainly outside of the statute permitting a deduction for interest paid on an indebtedness. Cf. *W. Stuart Emmons*, *supra*, where we said at page 31:

In the case at bar we might well paraphrase some of the statements of the Supreme Court in the *Gregory* case. Thus, section 23(b) requires a payment for the use or forbearance of money, and not a payment in pursuance of a plan (the creation of an interest deduction) having no relation to the purported result, the purchase of an annuity. The real payment here was not the alleged interest; it was the net consideration, i.e., the first year's premium plus the advance payment of future premiums plus the purported interest, less the "cash or loan" value of the policy. And the benefit sought was not an annuity contract, but rather a tax deduction of that part of the gross outlay designated for that purpose as "interest." Petitioner did not seek an annuity, and in fact gave up all substantial rights of an annuitant in order to reach his true goal, deductions in an amount large enough to reduce his taxes in a sum greater than the net consideration or cost to him of the entire operation.

Petitioners correctly note that the interest deduction does not require a business or profit motive or purpose. It does, however, require a payment of interest on an existing indebtedness, and the contention thus begs the very point in issue.

Had petitioners in fact borrowed money for a vacation, or for any other purely personal purpose, they would clearly be entitled to a deduction for any interest paid on such loan, and we do not understand respondent to contend otherwise. We must first, however, determine whether petitioners in fact incurred a bona fide indebtedness regardless of their reasons for doing so. We are forced to conclude in the light of the entire record that they did not.

Petitioners did not purport to borrow funds for personal reasons, but rather in respect of hardheaded commercial transactions for profit. They acted within the formal framework of such premise, and it is in the light of the nature of the transactions as claimed by them that we must determine the reality or lack of it in what they did.

Petitioners here purported to enter into a profit-seeking transaction. Yet under the circumstances, no reasonable chance existed of realizing a profit, apart from the "tax gimmick" feature of the transactions, the very aspect in which they were originally presented to

and found acceptable by petitioners. It is for this reason that we conclude that the transactions in question, the reality of which may be sustained only on the theory that they were commercial undertakings for profit, were shams, and must be disregarded for tax purposes. Accordingly, respondent's determination is here sustained. Cf. *L. Lee Stanton*, 34 T.C. 1.

Petitioners now seek, in the alternative, deductions for their net expenditures as losses under section 23(e)(2) of the Internal Revenue Code of 1939.[1] As authority, they cite the Court of Appeals in the *Goodstein* case, which reversed our decision on this issue.

In *Goodstein* the fourth paragraph of the petition reads in part as follows:

c. If the said interest payments are not deductible, the Commissioner erred in failing to allow the sum of $14,722.02 as a loss deduction in the computation of petitioners' taxable income for 1952.

No such provision appears in either of the petitions filed here. The point was first raised in petitioners' supplemental brief. Manifestly, the issue was not properly pleaded, and we may not now consider it.

Respondent's present position with respect to the principal issue is to ignore the disputed transactions entirely for tax purposes, both as to income and expense. For protective purposes, he did not in the notice of deficiency delete from petitioners' income certain items which should be eliminated under his present theory, which we believe sound. Accordingly,

*Decisions will be entered under Rule 50.*

---

[1] SEC. 23. DEDUCTIONS FROM GROSS INCOME.
   In computing net income there shall be allowed as deductions:
   \*          \*          \*          \*          \*          \*          \*
   (e) LOSSES BY INDIVIDUALS.—In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise—
   \*          \*          \*          \*          \*          \*          \*
   (2) if incurred in any transaction entered into for profit, though not connected with the trade or business; \*\*\*