132 T.C. No. 4


UNITED STATES TAX COURT



HENRY AND SUSAN F. SAMUELI, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

THOMAS G. AND PATRICIA W. RICKS, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent



Docket Nos. 13953-06, 14147-06.   Filed March 16, 2009.



Ps-S purchased an approximate $1.64 billion of securities from F in October 2001 and simultaneously transferred the securities back to F pursuant to F's promise to transfer identical securities to Ps-S on Jan. 15, 2003.  The agreement between Ps-S and F allowed Ps-S to require an earlier transfer of the identical securities only by terminating the transaction on July 1 or Dec. 2, 2002.  Ps-S did not require an earlier transfer and sold the securities to F on Jan. 15, 2003.  Ps treated the transaction as a securities lending arrangement subject to sec. 1058, I.R.C., and Ps-S reported an approximate $50.6 million long-term capital gain on the sale.  Ps also deducted millions of dollars of interest related to the transaction.  R determined that the transaction was not a securities lending arrangement subject to sec. 1058, I.R.C.  Instead, R determined that Ps-S purchased the

securities from and immediately sold the securities to F in 2001 at no gain or loss and then repurchased from (pursuant to a forward contract) and immediately resold the securities to F in 2003 realizing an approximate $13.5 million short-term capital gain. R also disallowed all of Ps' interest deductions because the corresponding debt that Ps claimed was related to the transaction did not exist.

Held: The transaction is not a securities lending arrangement subject to sec. 1058, I.R.C., because the ability of Ps-S to cause F to transfer the identical securities to Ps-S on only three of the approximate 450 days during the transaction period reduced their "opportunity for gain * * * in the transferred securities" under sec. 1058(b)(3), I.R.C. The substance of the transaction was the purchases and sales that R determined.

Held, further, Ps are not entitled to their claimed interest deductions because the debt Ps claimed was related to the transaction did not exist.

Nancy L. Iredale, Jeffrey G. Varga, and Stephen J. Turanchik, for petitioners.

Miles B. Fuller and Louis B. Jack, for respondent.

OPINION

KROUPA, Judge: These consolidated cases are before the Court on petitioners' motion for summary judgment and respondent's cross-motion for partial summary judgment. Respondent determined a $2,177,532 deficiency for 2001 and a $171,026 deficiency for 2003 in the Federal income taxes of Henry and Susan F. Samueli (collectively, Samuelis). Respondent determined a $6,126 deficiency for 2001 in the Federal income tax

of Thomas G. and Patricia W. Ricks (collectively, Rickses). Each deficiency relates to petitioners' participation in a leveraged securities transaction (Transaction).[1] Petitioners treated the Transaction as a securities lending arrangement subject to section 1058,[2] the provisions of which we set forth in an appendix.

These cases present an issue of first impression on the interpretation of section 1058(b)(3). Specifically, we decide whether the agreement (Agreement) underlying the Transaction did "not reduce the * * * opportunity for gain of the transferor of the securities in the securities transferred" within the meaning of section 1058(b)(3). We agree with respondent's primary determination that the Agreement did reduce the Samuelis' opportunity for gain in the securities (Securities) transferred in the Transaction. Accordingly, we hold that the Transaction did not qualify as a securities lending arrangement under section 1058. We also decide whether petitioners may deduct interest claimed paid with respect to the Transaction. We hold they may not because the debt that petitioners claimed was related to the Transaction did not exist.

---

[1]The Samuelis were the primary participants in the Transaction. The relevant participation of the Rickses involved their claim to an interest deduction related to the Transaction.

[2]Section references are to the applicable versions of the Internal Revenue Code, and Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise stated.

## Background

### I. Preliminaries

The parties filed an extensive stipulation of facts with accompanying exhibits. We treat the facts set forth in this background section as true solely for purposes of deciding the parties' motions, not as findings of fact for these cases. See Fed. R. Civ. P. 52(a); P & X Mkts., Inc. v. Commissioner, 106 T.C. 441, 442 n.2 (1996), affd. without published opinion 139 F.3d 907 (9th Cir. 1998).

### II. Individuals and Entities

#### A. Overview of Petitioners

Petitioners are two couples, each husband and wife, who filed joint Federal individual income tax returns for the relevant years. Each petitioner resided in California when his or her petition was filed with the Court.

#### B. Mr. Samueli

Henry Samueli (Mr. Samueli) is a billionaire who co-founded Broadcom Corporation, a publicly traded company listed on the NASDAQ Exchange.

#### C. H&S Ventures

H&S Ventures, LLC (H&S Ventures), was a limited liability company that was treated as a partnership for Federal tax purposes. Mr. Samueli owned 10 percent of H&S Ventures, Susan Samueli owned 10 percent of H&S Ventures, and the Samuelis'

grantor trust (Shiloh) owned the remaining 80 percent of H&S Ventures.[3]  H&S Ventures was the primary entity through which the Samuelis conducted their business affairs.

### D.  Mr. Ricks and Mr. Schulman

Thomas Ricks (Mr. Ricks) was the chief investment officer for H&S Ventures and an investment adviser to the Samuelis. Michael Schulman (Mr. Schulman) was the managing director of H&S Ventures and the Samuelis' personal attorney.

### E.  TFSC

Twenty-First Securities Corporation (TFSC) was a brokerage and financial services firm specializing in structuring leveraged securities transactions for wealthy clients.  TFSC structured the Transaction for the Samuelis.  TFSC was unrelated to the Samuelis.

## III.  Genesis of the Transaction

TFSC had forecast in 2001 that interest rates would decline. Katherine Szem (Ms. Szem), then a tax partner with Arthur Andersen LLP, discussed with Thomas Boczar (Mr. Boczar), Director of Marketing for Financial Institutions at TFSC, the pricing and mechanics of a leveraged securities transaction for the Samuelis. Ms. Szem suggested to Mr. Schulman that the Samuelis consider entering into a leveraged securities transaction.

---

[3]The parties agree that Shiloh is disregarded for Federal tax purposes because it was a grantor trust subject to secs. 671 through 679.  We refer to Shiloh as the Samuelis.

Mr. Boczar forwarded to Mr. Ricks hypothetical leveraged transactions using fixed-income securities including U.S. Treasury STRIPS and agency STRIPS,[4] such as those from the Federal Home Loan Mortgage Corporation (Freddie Mac). The profitability of these transactions hinged on a fluctuation of market interest rates favorable to the investor; i.e., an investor would borrow money at a variable interest rate to invest in fixed-income securities and could realize a gain from the investment if market interest rates then declined. Two days later, Mr. Ricks recommended to Mr. Schulman that the Samuelis invest in a proposed leveraged securities transaction. Shortly after that, the Samuelis decided to make such an investment.

IV. The Transaction

A. Investors in the Transaction

The Samuelis, the Rickses, and Mr. Schulman invested in the Transaction. The Samuelis held a 99.5-percent interest in the Transaction. The Rickses and Mr. Schulman collectively held the remaining one-half-percent interest. The Rickses' interest was .2 percent, and Mr. Schulman's interest was .3 percent.

---

[4]The word "STRIPS" is an acronym for the investment term "Separate Trading of Registered Interest and Principal of Securities." See Acronyms, Initialisms & Abbreviations Dictionary 3455 (20th ed. 1996).

B.  Documents Underlying the Transaction

The Transaction was governed by five written documents entered into by and between the Samuelis and their securities broker, Refco Securities, LLC (Refco).  These documents were a(n):  (1) Master Securities Loan Agreement (MSLA); (2) Amendment to Master Securities Loan Agreement (Amendment); (3) Addendum to the Master Securities Loan Agreement (Addendum); (4) Client's Agreement/Margin Agreement (Client Agreement); and (5) Refco Statement of Interest Charges Pursuant to the "Truth-In-Lending" Rule 10(b)-16.  The MSLA, the Amendment, and the Client Agreement were each entered into on or about October 11, 2001.  The Addendum was dated October 17, 2001.

C.  Specifics of the Transaction

The Samuelis and Refco entered into the MSLA and the Amendment approximately a week after the TFSC's marketing director contacted the Samuelis' trusted adviser.  Both the MSLA and the Amendment were on standard forms used by the Bond Market Association.[5]  The MSLA and the Amendment required the Samuelis to acquire the Securities from Refco through the use of a margin loan and then to "loan" the Securities to Refco.  The MSLA and the Amendment allowed the Samuelis to terminate the Transaction

_____

[5]The Bond Market Association (formerly known as the Public Securities Association) was the international trade association for the bond market industry.  The Bond Market Association merged with the Securities Industry Association on Nov. 1, 2006, to form the Securities Industry & Financial Markets Association.

(and thus cause Refco to transfer to the Samuelis securities identical to the Securities) by giving notice to Refco before the close of business on any "business day."[6]  The Client Agreement allowed Refco to hold the Securities as security for the margin loan and to subject the Securities to a general lien and right of setoff for all obligations of the Samuelis to Refco.

Refco and the Samuelis also entered into the Addendum. Unlike the MSLA and the Amendment, the Addendum was customized and provided that the Samuelis' "loan" of the Securities to Refco would terminate on January 15, 2003 (and thus require Refco on that date to provide the Samuelis with the Securities).  The Addendum also allowed the Samuelis to terminate the Transaction earlier on July 1 or December 2, 2002 (early termination dates). Refco could purchase the Securities from the Samuelis at a price established under a LIBOR-based formula set forth in the Addendum if the Transaction was terminated on either early termination date.[7]

---

[6]The MSLA defined a "business day" as a day on which regular trading occurred in the principal market for the Securities.  We include the identical securities in our term "Securities."

[7]"LIBOR" is an acronym for "London Interbank Offering Rate." See generally Bank One Corp. v. Commissioner, 120 T.C. 174, 189 (2003), affd. in part and vacated in part sub nom. J.P. Morgan Chase & Co. v. Commissioner, 458 F.3d 564 (7th Cir. 2006).

D.   The Samuelis' 2001 Purchase

The Samuelis purchased the Securities from Refco in October 2001.[8]  The Securities consisted of a $1.7 billion principal STRIP of the $5.7 billion principal on an unsecured fixed-income obligation issued by Freddie Mac.  The maturity date of the obligation was February 15, 2003, and the yield to maturity on October 17, 2001, at which the Securities accrued interest, was fixed at 2.581 percent.

The Samuelis purchased the Securities at a price of $1,643,322,000 ($1.64 billion).  The Samuelis paid the $1.64 billion by obtaining a margin loan of the same amount from Refco pursuant to the Client Agreement.  The Samuelis deposited $21.25 million with Refco to obtain the margin loan.  Refco held the Securities as security for the margin loan, and the Securities were subject to Refco's general lien and right of setoff for all of the Samuelis' obligations to Refco.

Mr. Ricks paid $42,500 to participate in the Transaction. He paid this amount to purchase the Rickses' .2-percent ownership interest in the Securities owned by the Samuelis ($42,500/$21,250,000 = .2%).

---

[8]The trade underlying this purchase was placed on Oct. 17, 2001, and the trade settled on Oct. 19, 2001.

E.   The Samuelis' 2001 Transfer

The Samuelis transferred the Securities to Refco when their trade for the purchase of the Securities settled.  The MSLA required Refco to transfer "cash collateral" to the Samuelis equal to at least 100 percent of the market value of the Securities before or concurrently with the Samuelis' transfer. Refco transferred $1.64 billion to the Samuelis as cash collateral contemporaneously with the Samuelis' transfer of the Securities to Refco.  The Samuelis used that $1.64 billion upon receipt to repay the margin loan.  The MSLA stated that the Samuelis were entitled to receive all interest, dividends, and other distributions attributable to the Securities.

F.   Variable Rate Fee

The Samuelis were obligated to pay Refco a fee (variable rate fee) for use of the $1.64 billion cash collateral.  The amount of the variable rate fee was calculated by applying a market-based variable interest rate to the amount of the cash collateral.  That variable rate generally reset on the first Monday of each month from November 5, 2001, to January 14, 2003, to a rate equal to 1-month LIBOR plus 10 basis points.  The variable rate was 2.60125 percent from October 19 to November 4, 2001, and decreased steadily through January 15, 2003, to 1.48 percent.  The Samuelis accrued interest on their $21.25 million deposit at the same rate as the variable rate.

V.  The Samuelis' December 2001 Payment

Petitioners calculated that $7,815,983 ($7.8 million) of interest had accrued on the cash collateral as of December 28, 2001, and on that date the Samuelis (on behalf of themselves, the Rickses, and Mr. Schulman) wired the $7.8 million to Refco as payment of that interest.  Mr. Boczar had informed Mr. Ricks approximately two weeks before that the money could be returned to the Samuelis two weeks after the transfer.  Refco applied the $7.8 million to reduce the variable rate fee calculated as owed to it with respect to the cash collateral.

Refco transferred $7.8 million to the Samuelis approximately two weeks after the Samuelis' transfer, and Refco recorded its transfer to the Samuelis as additional cash collateral.  The MSLA allowed the Samuelis to borrow an additional $7.8 million because the Securities had increased in value.

VI.  Termination of the Transaction

The Samuelis did not terminate the Transaction on either early termination date, and the Transaction terminated on January 15, 2003.  Refco obligated itself on the termination day to pay the Samuelis $1,697,795,219 ($1.69 billion) to purchase the Securities in lieu of transferring the Securities to the Samuelis.  The $1.69 billion reflected the amount for which the Securities were trading on January 15, 2003.  Simultaneously with Refco's obligating itself to pay the $1.69 billion to the

Samuelis, the Samuelis obligated themselves to pay $1,684,185,567 ($1.68 billion) to Refco. The $1.68 billion reflected repayment of the $1.64 billion cash collateral, plus unpaid variable rate fees that had accrued during the term of the Transaction.

The Samuelis determined that they realized a $13,609,652 ($13.6 million) economic gain on the Transaction. The $13.6 million economic gain resulted from the $1.69 billion that Refco obligated itself to pay to the Samuelis less the $1.68 billion that the Samuelis obligated themselves to pay to Refco. The Samuelis received a $35,388,983 ($35.3 million) wire transfer from Refco on January 16, 2003. The $35.3 million reflected the $13.6 million determined economic gain, plus a return of the $21.25 million the Samuelis deposited with Refco to obtain the margin loan, plus accrued interest of $529,331.

## VII. Petitioners' Reporting Position

The Samuelis claimed an interest deduction on their return for 2001 for their reported portion of the $7.8 million wired to Refco as an accrued interest payment on December 28, 2001. Their reported portion, $7,796,903, was an approximate 99.8 percent of the total payment. The Rickses also claimed on their return for 2001 an interest deduction for their portion of the $7.8 million. Their portion, $15,667, was .2 percent of the total payment.

On their return for 2003, the Samuelis reported that they realized a $50,661,926 long-term capital gain from the Transaction.  They calculated that gain as follows:

| | |
|---|---:|
| Proceeds of sale of securities from the Samuelis to Refco | $1,697,795,219 |
| Less:  Purchase price of securities | 1,643,322,000 |
| Less:  Transaction costs | 3,556,710 |
| Gain | 50,916,509 |
| The Samuelis' 99.5-percent ownership interest | .995 |
| Capital gain to the Samuelis | 50,661,926 |

The Samuelis reported the $50,661,926 gain as a long-term capital gain because they held the Securities for over a year.

The Samuelis treated the $1.68 billion (the original cash collateral plus the unpaid variable rate fees) as accrued cash collateral fees and claimed they were entitled to deduct a portion ($32,792,720) as interest for 2003.  The Rickses did not deduct any cash collateral fees for 2003.

VIII.  Respondent's Determination

Respondent determined that the Transaction did not qualify as a securities lending arrangement under section 1058.  Instead, respondent determined that the Samuelis purchased the Securities from and immediately sold the Securities to Refco in October 2001 and then repurchased from (pursuant to a forward contract) and immediately resold the Securities to Refco in January 2003.[9] Thus, respondent determined, the Samuelis realized no gain or

---

[9]We use the term "forward contract" to refer to a contract to buy the Securities for a fixed price on a date certain.

loss on the sale in 2001 and realized a short-term capital gain of $13,541,604 on the sale in 2003. Further, respondent determined, petitioners could not deduct the cash collateral fees claimed paid as interest in connection with the reported securities lending arrangement because no debt existed.

### Discussion

#### I. Overview

Petitioners argue in moving for summary judgment that the Agreement satisfied each requirement set forth in section 1058(b). Respondent counters that he is entitled to partial summary judgment because the Agreement did not meet the specific requirement in section 1058(b)(3). Respondent does not challenge petitioners' assertion that the Agreement satisfied each of the other requirements set forth in section 1058(b). We therefore shall decide whether full or partial summary judgment is appropriate.

#### II. General Rules for Summary Judgment

Summary judgment is intended to expedite litigation and to avoid unnecessary and expensive trials of phantom factual issues. See Fla. Country Clubs, Inc. v. Commissioner, 122 T.C. 73, 75 (2004), affd. 404 F.3d 1291 (11th Cir. 2005). A decision on the merits of a taxpayer's claim can be made by way of summary judgment "if the pleadings, answers to interrogatories, depositions, admissions, and any other acceptable materials,

together with the affidavits, if any, show there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law." Rule 121(b). The moving party bears the burden of proving that there is no genuine issue of material fact, and factual inferences are drawn in a manner most favorable to the party opposing summary judgment. See Dahlstrom v. Commissioner, 85 T.C. 812, 821 (1985); Jacklin v. Commissioner, 79 T.C. 340, 344 (1982). Because summary judgment decides against a party before trial, we grant such a remedy cautiously and sparingly, and only after carefully ascertaining that the moving party has met all requirements for summary judgment. See Associated Press v. United States, 326 U.S. 1, 6 (1945).

III. Primary Issue Under Section 1058(b)(3)

The primary issue under section 1058(b)(3) is ripe for summary judgment. That issue turns on the interpretation of section 1058(b)(3), and the parties agree on all material facts relating to the issue. Thus, to decide the issue we need only interpret the plain meaning of the text "not reduce the * * * opportunity for gain of the transferor of the securities in the securities transferred" and apply that interpretation to the agreed-upon facts. See Glass v. Commissioner, 124 T.C. 258, 281 (2005), affd. 471 F.3d 698 (6th Cir. 2006). We interpret that text as written in the setting of the statute as a whole. See Fla. Country Clubs, Inc. v. Commissioner, supra at 75-76; see

also <u>Huffman v. Commissioner</u>, 978 F.2d 1139, 1145 (9th Cir. 1992), affg. T.C. Memo. 1991-144.

We focus on the meaning of the phrase "not reduce the * * * opportunity for gain of the transferor of the securities in the securities transferred." We understand the verb "reduce" to mean "to diminish in size, amount, extent, or number." Webster's Third New International Dictionary 1905 (2002). We understand the noun "opportunity" to mean "a combination of circumstances, time, and place suitable or favorable for a particular activity or action" and to be synonymous with the word "chance." <u>Id.</u> at 1583. We therefore read the relevant phrase in the context of the statutory scheme to mean that the Agreement will not meet the requirement set forth in section 1058(b)(3) if the Agreement diminished the Samuelis' chance to realize a gain that was present in the Securities during the transaction period. Stated differently, the Samuelis' opportunity for gain as to the Securities was reduced on account of the Agreement if during the transaction period their ability to realize a gain in the Securities was less with the Agreement than it would have been without the Agreement.

We conclude that the Agreement reduced the Samuelis' opportunity for gain in the Securities for purposes of section 1058(b)(3) because the Agreement prevented the Samuelis on all but three days of the approximate 450-day transaction period from

causing Refco to transfer the Securities to the Samuelis. Absent the Agreement, the Samuelis could have sold the Securities and realized any inherent gain whenever they wanted to simply by instructing their broker to execute such a sale. With the Agreement, however, the Samuelis' ability to realize such an inherent gain was severely reduced in that the Samuelis could realize such a gain only if the gain continued to be present on one or more of the three stated days. Stated differently, the Samuelis' opportunity for gain was reduced by the Agreement because the Agreement limited their ability to sell the Securities at any time that the possibility for a profitable sale arose.[10]

In so concluding, we reject petitioners' argument that they always retained the opportunity for gain in the Securities by continuing to own the Securities from the day they purchased them until the day they sold them. A taxpayer's opportunity for gain under petitioners' theory is not reduced for section 1058 purposes if the taxpayer retains the opportunity for gain as of the end of a loan period. The statute does not speak to retaining the opportunity for gain. It speaks to whether the opportunity for gain was reduced.

---

[10]Petitioners concede that the Agreement increased the Samuelis' risk of loss because the Samuelis could not terminate the Transaction at any time. We infer from this concession that the Agreement also reduced the Samuelis' opportunity for gain as to the Securities.

In addition, we read the relevant requirement differently from petitioners to measure a taxpayer's opportunity for gain as of each day during the loan period.  A taxpayer has such an opportunity for gain as to a security only if the taxpayer is able to effect a sale of the security in the ordinary course of the relevant market (e.g., by calling a broker to place a sale) whenever the security is in-the-money.  A significant impediment to the taxpayer's ability to effect such a sale, e.g., as occurred here through the specific 3-day limit as to when the Samuelis could demand that Refco transfer the Securities to them, is a reduction in a taxpayer's opportunity for gain.

Nor did the Samuelis' opportunity for gain turn, as petitioners would have it, on the consequences of the Samuelis' variable rate financing arrangement.  Petitioners assert that their opportunity for gain as to the Securities depended entirely on whether their fixed return on the Securities was greater than their financing expense (i.e., the variable rate fee paid to Refco) and conclude that the Agreement did not reduce this opportunity because they continued to retain this opportunity throughout the transaction period.  Section 1058(b)(3) speaks solely to the transferor's "opportunity for gain * * * in the securities transferred" and does not implicate the consideration of any independent gain that the transferor may realize outside of those securities (e.g., through a favorable financing

arrangement). Thus, while the profitability of the Transaction may have depended on the return that the Samuelis earned on the Securities vis-a-vis the amount of the variable rate fee that they paid to Refco, the Samuelis' opportunity for gain in the transferred securities rested on the fluctuation in the value of the Securities.

We also reject petitioners' assertion that the Samuelis could have locked in their gain in the Securities on any day of the transaction period simply by entering in the marketplace into a financial transaction that allowed them to fix their gain, e.g., by purchasing an option to sell the Securities at a fixed price. This assertion has no direct bearing on our inquiry. Section 1058 concerns itself only with the agreement connected with the transfer of the securities. Whether the Samuelis could have entered into another agreement to lock in their gain is of no moment.[11]

We also reject petitioners' argument that section 1058(b)(3) cannot contain a requirement that loaned securities be returned

---

[11]Petitioners also assert that the Transaction is a routine securities lending transaction in the marketplace. We disagree. A lender could terminate a security loan on any business day under the standard form used in the marketplace. The parties to the Transaction, however, modified the standard form to eliminate that standard provision and to prevent the Samuelis from demanding that the Securities be transferred to them during the transaction period, except on the three specific days.

to the lender upon the lender's demand at any time because section 512(a)(5)(B) specifically contains such a requirement. Section 512(a)(5)(A) generally defines the phrase "payments with respect to securities loans" by reference to "a security * * * transferred by the owner to another person in a transaction to which section 1058 applies." Section 512(a)(5)(B) adds that section 512(a)(5)(A) shall apply only where the agreement underlying the transaction "provides for * * * termination of the loan by the transferor upon notice of not more than 5 business days." Petitioners argue that sections 512(a)(5)(B) and 1058(b)(3) were enacted in the same legislation and that Congress is presumed not to have included unnecessary words in a statute. See, e.g., Kawaauhau v. Geiger, 523 U.S. 57, 62 (1998); Johnson v. Commissioner, 441 F.3d 845, 850 (9th Cir. 2006). Petitioners conclude that part of section 512(a)(5)(B) would be surplusage were a prompt return of a security already a requirement of section 1058(b). Again, we disagree.

Our reading of section 1058(b)(3) to require that the lender be able to demand a prompt return of the loaned securities does not render any part of section 512(a)(5)(B) surplusage. Section 1058(b)(3) does not require explicitly that a securities loan be terminable within a set period akin to the 5-day period of section 512(a)(5)(B). It does not necessarily follow, however, as petitioners ask us to conclude, that section 1058(b)(3) fails

to require that the lender be able to demand a prompt return of the loaned securities.  The firmly established law at the time of the enactment of those sections provided that a lender in a securities loan arrangement be able to terminate the loan agreement upon demand and require a prompt return of the securities to the lender.  We read nothing in the statute or in its history that reveals that Congress intended to overrule that firmly established law by enacting sections 512(a)(5)(B) and 1058(b)(3).  We decline to read such an intent into the statute. Such is especially so given the plain reading of the terms "reduce" and "opportunity for gain" and our finding that the Agreement reduced the Samuelis' opportunity for gain by limiting their ability to sell the Securities at any time that the possibility for a profitable sale arose.

We recognize that unequivocal evidence of a clear legislative intent may sometimes override a plain meaning interpretation and lead to a different result.  See Consumer Prod. Safety Commn. v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980); see also Albertson's, Inc. v. Commissioner, 42 F.3d 537, 545 (9th Cir. 1994), affg. 95 T.C. 415 (1990).  The legislative history of the applicable statute supports the plain meaning of the relevant text and does not override it.  Congress enacted section 1058 mainly to clarify the then-existing law that applied to the loan of securities by regulated investment companies and

tax-exempt entities, on the one hand, and by general security lenders, on the other hand.  See S. Rept. 95-762, at 4 (1978). The former group of lenders was concerned that payments made to them by the borrowers of securities could be considered unrelated business taxable income.  See id.  The latter group of lenders was concerned that a securities loan could be considered a taxable disposition.  See id. at 5-6.  Congress added section 1058 to the Code to address each of these concerns, explicitly providing through the statute that payments from borrowers to tax-exempt entities were considered investment income to the tax-exempt entities and clarifying that the existing law that applied to lenders of securities in general continued to apply. See id. at 6-7.

The Senate Committee on Finance noted that owners of securities were reluctant under existing law to enter into securities lending transactions because the income tax treatment of those transactions was uncertain.  See id. at 4.  The committee also noted that the Commissioner apparently agreed that a securities lending transaction was not a taxable disposition of the loaned securities and that the transaction did not interrupt the lender's holding period, but that the Commissioner had recently declined to issue rulings stating as much.  See id. at 4.  The committee believed a clarification of existing law was required to encourage organizations and individuals with

securities holdings to enter into securities lending transactions so as to allow the lendee brokers to deliver the securities to a purchaser of the securities within the time required by the relevant market rules. See id. at 5. The committee explained that section 1058 codified the existing law on securities lending arrangements that required that a contractual obligation subject to that law did not differ materially either in kind or in extent from the securities exchanged. See id. at 7.

This legislative history is consistent with our analysis. The legislative history explains that section 1058 codified the firmly established law requiring that a securities loan agreement keep the lender in the same economic position that the lender would have been in had the lender not entered into the agreement. For example, the lender must possess all of the benefits and burdens of ownership of the transferred securities and be able to terminate the loan agreement upon demand. The firmly established law came from the United States Supreme Court in Provost v. United States, 269 U.S. 443 (1926). There, the taxpayers sought to recover the cost of internal revenue stamps affixed by them to "tickets" that evidenced transactions where shares of stock were "loaned" to brokers or returned by the borrower to the lender, each in accordance with the rules and practice of the Stock Exchange. See id. at 449. The Court held that those transfers of stock were taxable transfers within the meaning of the

applicable Revenue Acts because "both the loan of stock and the return of the borrowed stock involve 'transfers of legal title to shares of stock'." Id. at 456.  The Court noted that a lender of securities under a loan agreement retained all of the benefits and burdens of the loaned stock throughout the loan period, as though the lender had retained the stock, and that both parties to the loan agreement could terminate the agreement on demand and thus cause a return of the stock to the lender.[12]  See id. at 452-453.

---

[12]The Commissioner later ruled similarly in Rev. Rul. 57-451, 1957-2 C.B. 295.  That ruling, which is referenced in the legislative history to sec. 1058, see S. Rept. 95-762, at 4 (1978), states in relevant part:

> The second situation described above, wherein the optionee authorizes the broker to "lend" his stock certificates to other customers in the ordinary course of business, presumably anticipates the "loan" of the stock to others for use in satisfying obligations incurred in short sale transactions.  In such a case, all of the incidents of ownership in the stock and not mere legal title, pass to the "borrowing" customer from the "lending" broker.  For such incidents of ownership, the "lending" broker has substituted the personal obligation, wholly contractual, of the "borrowing" customer to restore him, on demand, to the economic position in which he would have been as owner of the stock, had the "loan" transaction not been entered into.  See Provost v. United States, 269, U.S. 443, T.D. 3811, C.B. V-1, 417 (1926).  Since the "lending" broker is not acting as the agent of the optionee in such a transaction, he must have necessarily obtained from the optionee all of the incidents of ownership in the stock which he passes to his "borrowing" customer. [Rev. Rul. 57-451, 1957-2 C.B. at 297.]

We conclude that the Transaction was not a securities lending arrangement subject to section 1058 and that the underlying transfers of the Securities in 2001 and 2003 were therefore taxable events. Respondent determined and argues that the Samuelis' transfer of the Securities to Refco in 2001 was in substance a sale of the Securities by the Samuelis in exchange for the $1.64 billion they received as cash collateral and that Refco's purchase of the Securities in 2003 was a second sale of the Securities by the Samuelis in exchange for the money wired to them on January 16, 2003. For Federal tax purposes, the characterization of a transaction depends on economic reality and not just on the form employed by the parties to the transaction. See Frank Lyon Co. v. United States, 435 U.S. 561, 572-573 (1978).

We agree with respondent that the economic reality of the Transaction establishes that the Transaction was not a securities lending arrangement as structured but was in substance two separate sales of the Securities without any resulting debt obligation running between petitioners and Refco from October 2001 through January 15, 2003.[13] The transfers in 2001 were in

---

[13]The Transaction is similar to the transactions involved in a long line of cases involving M. Eli Livingstone, a broker and securities dealer who aspired to create debt through initial steps that completely offset each other. Courts consistently disregarded those offsetting steps because they left the parties to the transactions in the same position they were in before the

(continued...)

substance the Samuelis' purchase and sale of the Securities at the same price of $1.64 billion. The Samuelis therefore did not realize any gain in 2001 as to the Securities. The transfers in 2003 were in substance the Samuelis' purchase of the Securities from Refco at $1.68 billion (the purchase price determined in accordance with the terms of the Addendum, which operated as a forward contract), followed immediately by the $1.69 billion market-price sale of the Securities by the Samuelis back to Refco. The Samuelis therefore realized a capital gain on the sale in 2003 equal to the difference between the purchase and sale prices. See sec. 1001. That capital gain is taxed as a short-term capital gain because the Samuelis held the Securities for less than a year.[14] See sec. 1222.

---

[13](...continued)
steps were taken. See, e.g., Cahn v. Commissioner, 358 F.2d 492 (9th Cir. 1966), affg. 41 T.C. 858 (1964); Jockmus v. United States, 335 F.2d 23, 29 (2d Cir. 1964); Rubin v. United States, 304 F.2d 766 (7th Cir. 1962); Lynch v. Commissioner, 273 F.2d 867, 872 (1st Cir. 1959), affg. 31 T.C. 990 (1959) and Julian v. Commissioner, 31 T.C. 998 (1959); Goodstein v. Commissioner, 267 F.2d 127, 131 (2d Cir. 1959), affg. 30 T.C. 1178 (1958); MacRae v. Commissioner, 34 T.C. 20, 26 (1960), affd. on this issue 294 F.2d 56 (9th Cir. 1961). The courts did not disregard the transactions entirely as shams or as lacking economic substance. The courts disregarded the initial steps and recast the transactions as exchanges of promises for future performance. The transaction in one case was even recast where the taxpayer made an economic profit. See Rubin v. United States, supra.

[14]Petitioners argue they still prevail even if we accept, as we do, respondent's characterization of the Transaction. Petitioners assert that their sale of the Securities in 2003 was in consideration for their surrender of their contractual right

(continued...)

IV.  Secondary Issue Concerning Interest Deductions

The secondary issue for decision involves petitioners' claim to interest deductions.  Our decision as to this issue also does not turn on any disputed fact.  Thus, this issue is also ripe for summary judgment.

Respondent disallowed petitioners' deductions for interest paid to Refco in 2001 and in 2003 because "there was no collateral outstanding and the payment did not represent a payment of interest 'on indebtedness'."  Petitioners argue that their payment in 2001 was made with respect to debt in the form of the cash collateral.  Again, we disagree.  We conclude on the basis of the recharacterized transaction that petitioners may not deduct their claimed interest payments for 2001 and 2003 because those payments were unrelated to debt.  The cash transferred in 2001 represented the proceeds of the first sale and not collateral for a securities loan.  Thus, no "cash collateral" was outstanding during the relevant years on which the claimed collateral fees could accrue.  Nor did the Samuelis transfer any cash in 2003 with respect to debt.  Their transfer of cash in

---

[14](...continued)
to receive the Securities.  Petitioners assert that this contractual right was a long-term asset acquired in October 2001 and that they may offset the $1.69 billion sale proceeds by their $1.64 billion basis in that long-term asset.  We disagree with this argument.  The Securities were the subject of the sale in 2003, not the surrender of a contractual right as petitioners assert.  In addition, the Samuelis transferred the $1.64 billion to Refco in 2001 to purchase the Securities.

2003 was to purchase the Securities pursuant to the forward contract.  Accordingly, we hold that petitioners are not entitled to their claimed interest deductions.

V.  Epilogue

We have considered all arguments petitioners have made and, to the extent not discussed, we have rejected those arguments as without merit.  To reflect the foregoing,

An appropriate order

will be issued.

APPENDIX

SEC. 1058.   TRANSFERS OF SECURITIES UNDER CERTAIN
            AGREEMENTS.

(a) General Rule.--In the case of a taxpayer who transfers securities (as defined in section 1236(c)) pursuant to an agreement which meets the requirements of subsection (b), no gain or loss shall be recognized on the exchange of such securities by the taxpayer for an obligation under such agreement, or on the exchange of rights under such agreement by that taxpayer for securities identical to the securities transferred by that taxpayer.

(b) Agreement Requirements.--In order to meet the requirements of this subsection, an agreement shall--

(1) provide for the return to the transferor of securities identical to the securities transferred;

(2) require that payments shall be made to the transferor of amounts equivalent to all interest, dividends, and other distributions which the owner of the securities is entitled to receive during the period beginning with the transfer of the securities by the transferor and ending with the transfer of identical securities back to the transferor;

(3) not reduce the risk of loss or opportunity for gain of the transferor of the securities in the securities transferred; and

(4) meet such other requirements as the Secretary may by regulation prescribe.

(c) Basis.--Property acquired by a taxpayer described in subsection (a), in a transaction described in that subsection, shall have the same basis as the property transferred by that taxpayer.